UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
www.flnb.uscourts.gov

IN RE:                                                         Case No. 17-40185-KKS

CAMPBELLTON-GRACEVILLE HOSPITAL
CORPORATION,                                          Chapter 11

      Debtor.
_____/

### DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER (I) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE FROM ALL LIENS, CLAIMS AND ENCUMBRANCES TO NORTHWEST FLORIDA HEALTHCARE, INC.; AND (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES

> **Statement of Need for Emergency Hearing**
>
> **The Debtor respectfully requests that the Court conduct an emergency hearing to consider this Motion during the week of July 10, 2017 or July 17, 2017, as it is of critical importance that this Motion be considered on an emergency basis as the hospital is currently facing the prospect of not being able to provide healthcare to the community and is rapidly running out of cash. The Debtor's main priority is to be able to continue to provide healthcare to the community. If the Debtor is unable to consummate a sale of its assets to the Buyer, as contemplated by this Motion, the Debtor believes that the Debtor will be forced to cease all healthcare services to the community. The proposed transaction contemplates continued healthcare in the community and the opportunity to maintain some jobs and the prospect of more services and jobs in the future.**

      The Debtor, Campbellton-Graceville Hospital Corporation (the "Debtor"), files this motion

(the "Motion") seeking entry of an order (i) approving the sale of substantially all of the Debtor's

assets free and clear of all liens, claims and encumbrances to Northwest Florida Healthcare, Inc.,

a Florida corporation ("Buyer"), and (ii) authorizing the assumption and assignment of certain

executory contracts and unexpired leases which Buyer agrees to assume, within Buyer's sole discretion.    The Debtor requests that the Motion be heard on an emergency basis and that the notice period be shortened accordingly.    In support of this Motion, the Debtor represents as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

2.    Venue for this Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 105, 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006.

## BACKGROUND

4.    On May 5, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.    The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.    The Debtor is a non-profit corporation established pursuant to the laws of the State of Florida in 1961 and operates as a not-for-profit 25-bed critical access hospital serving northern Florida, as well as surrounding areas in Georgia and Alabama, and had approximately 100 employees.    The Debtor offered comprehensive medical care, including emergency services, general hospitalization, laboratory services, swing bed, and physical therapy.

7.    The Court is aware of the facts and circumstances leading to the filing of the case (i.e., the improper reference lab program, the settlement with The Peoples Choice Hospital (the

"PCH Settlement"), and the Debtor's efforts to generate revenue and complete cost reports.   The Debtor's priority has been to continue to provide healthcare to the community and work to complete cost reports to restart Medicare/Medicaid reimbursement.   The Debtor has worked to cut costs to reduce monthly cash burn, but has also been seeking a transaction partner to purchase the assets of the hospital.   The plan has been, and will continue to be, to seek this path to maximize healthcare options in the community and then to pursue significant litigation claims for the benefit of creditors.

## RELIEF REQUESTED

### A.   Purchase of Assets

8.   The Debtor and the Buyer have recently entered into a Letter of Intent ("LOI") with respect to the purchase by the Buyer of substantially all of the assets of the Debtor used in the operation of the Debtor's business (the "Business") located at 5429 College Drive, Graceville, FL 32440 (the "Real Property"), free and clear of any and all liens, claims, encumbrances, and interests.   A copy of the LOI is attached hereto as **Exhibit "A"**.   The assets include, without limitation, the Real Property, including any improvements thereon, all equipment, tools, furniture, fixtures, motor vehicles, inventory, work product, books and records, and all other tangible personal property, other than the Excluded Assets[1]; all intellectual property (including, but not limited to, trade names, trademarks, copyrights, patents, licenses, data, software, domain names, and website content to the extent the Debtor is able to transfer such intellectual property, using its best efforts); patient lists, medical records, and goodwill; all rights and causes of action relating to the assets; and all other intangible and tangible property owned

---

[1] The Excluded Assets are defined as (a) those seven items of medical equipment on the premises of the hospital the purchase of which was financed by General Electric and that are subject to liens in favor of General Electric and leases which shall be rejected; (b) the cash, cash equivalents, and accounts receivables of the Debtor; and (c) Causes of Action, including Chapter 5 avoidance actions.

by the Debtor and/or used in, associated with, or necessary to operate the Debtor's business (collectively, the "Assets").   As set forth in the LOI, prior to the closing, the Buyer may determine, on a case-by-case basis in the Buyer's sole and absolute discretion, whether to acquire or not acquire any specific asset that is leased or encumbered by any indebtedness, lien, encumbrance, or other obligation.   Notwithstanding the foregoing, the Buyer shall acquire title to, and ownership of, the Real Property, and shall assume the outstanding indebtedness to ServiceFirst (the "Lender") currently encumbering the Real Property, which, as of the date of the LOI, is approximately $420,000.00 in the aggregate (the "Assumed Indebtedness").

9.    Pursuant to the LOI, the purchase price for the sale of the Assets will be the principal balance of the Assumed Indebtedness as of the Closing (the "Purchase Price").   The Purchase Price shall be satisfied by the assumption of the Assumed Indebtedness.

**B.    Assumption and Assignment of Leases and Executory Contracts**

10.    Pursuant to the LOI, the Debtor shall, pursuant to 11 U.S.C. § 365, assume and assign to the Buyer any and all executory contracts and unexpired leases of the Debtor utilized in the Business as the Buyer, in its sole and absolute discretion, designates, but excluding the executory contracts associated with the Excluded Assets (the "Assumed Contracts").[2]   The Buyer will not assume pre-Closing obligations or liabilities of the Debtor under the Assumed Contracts, such as cure payments or other amounts arising upon assumption pursuant to 11 U.S.C. § 365.   All such cure obligations relating to the Assumed Contracts shall be paid by the Debtor at Closing.   The Buyer will identify and designate the Assumed Contracts two (2) business days prior to the hearing before this Court to approve the sale of the Assets to the

---

[2] Seller and Buyer acknowledge that third party consents may be necessary for the assignment and assumption of the Assumed Contracts and will seek to obtain those consents.  Buyer has already informally discussed the assignment and assumption of the outstanding indebtedness encumbering the Real Property to Buyer (as described in Paragraph 8) with the Lender, and the Lender has advised that such consent will be granted.  However, the assignment and assumption of the outstanding indebtedness remains subject to the applicable Lender's written consent.

Buyer.  In no event will the Buyer assume any of the Debtor's provider agreements with third party payors, and the Buyer shall have no obligations or any liability with respect to those provider agreements.

11.    With the exception of post-Closing obligations under the Assumed Contracts, and the Assumed Indebtedness, the Buyer will assume no liabilities or other obligations, commercial or otherwise, of the Debtor, known or unknown, fixed or contingent, liquidated or unliquidated, secured or unsecured, or otherwise, regardless of when the same may arise or may have arisen.

**C.    Asset Purchase Agreement**

12.    Consummation of the sale of the Assets to the Buyer will be subject to the negotiation and execution of a definitive agreement (the "Definitive Agreement") no later than five (5) business days prior to the sale hearing, with terms satisfactory to the Debtor and Buyer and which, among other things, reflect the provisions summarized in the LOI.   The LOI does not set forth all of the matters upon which agreement must be reached in order for the sale to be consummated.  Once the Definitive Agreement has been finalized, it will be filed with the Court prior to the sale hearing on this Motion.

**D.    Employees**

13.    The Definitive Agreement shall provide that, as of the Closing of the sale of the Assets to the Buyer, the Debtor will terminate all of its employees who are involved in the operation of the Business.  It is anticipated that the Buyer may make offers of employment to certain employees of the Debtor as of the date of the Closing, and the Buyer has agreed to give first priority to the Debtor's current employees for jobs at the Real Property and at the Buyers nearby healthcare facilities to the extent that they have appropriate qualifications and experience for available positions.

**E.    Post-Closing Covenants.**

14.    The Definitive Agreement will include the following post-Closing covenants, which shall be binding on Buyer:

      a.   Buyer shall use commercially reasonable efforts to operate a healthcare clinic at the Real Property at least five calendar days during each calendar week for a minimum of one year from the date of the Closing; provided, however, that in the event that the taxing district in which the Business operates provides $400,000 of tax credits to Buyer for the purpose of operating the healthcare Clinic at the Real Property, then Buyer will expand the hours of operation of the clinic to no less than ten hours per day on weekdays and six hours per day on Saturdays and Sundays;

      b.   Buyer shall maintain the Debtor's patient medical records of the hospital pursuant to all applicable laws and requirements; and

      c.   Buyer shall use its commercially reasonable efforts to repurpose the existing hospital facility located at the Real Property such that the existing hospital facility can be used for healthcare purposes.

**F.    The Sale Order**

15.    The Sale Order approving the sale of the Assets to the Buyer, entered by the Bankruptcy Court under 11 U.S.C. § 363, shall be in form and substance satisfactory to the Buyer, in its sole discretion; shall be entered no later than September 30, 2017; and shall also provide, without limitation, that:

      a.   The Sale Transaction is or will be a legal, valid, enforceable, and effective transfer of the Assets to Buyer;

      b.   The Sale Transaction vests or will vest Buyer with good title to the Assets, which, except with respect to the Assumed Indebtedness, will be free and clear of all liens, claims, or encumbrances;

      c.   The Sale Transaction constitutes reasonably equivalent value and fair consideration for the Assets being purchased;

      d.   The Sale Transaction does not and will not subject Buyer to any liability by reason of such transfer under the laws of the United States, any State, or Commonwealth, territory, possession or the District of Columbia based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor or transferee liability;

     e.    The leases and executory contracts of Seller designated by Buyer prior to the Sale Hearing date shall be assumed and assigned to Buyer as of the date of Closing pursuant to 11 U.S.C. §365; and

     f.    Buyer shall be found by the Bankruptcy Court to be a good faith purchaser of the Assets, as that term is used in 11 U.S.C. §363(m).

16.    The Debtor intends for the Sale to take place as promptly as possible so as to continue to provide healthcare in the community.

17.    The Debtor acknowledges that typically a more fulsome sale process and perhaps even a competitive bidding process would be appropriate for a sale of this nature.   However, such a process is not warranted or possible under the facts and circumstances in this case.   First, the Debtor has faced financial distress for a number of years.   Glass Ratner, as CRO, has done as detailed an analysis as possible under the circumstances.   The conclusion is unfortunate – even if Medicare and Medicaid reimbursements were restarted immediately, the Debtor operating as a hospital simply does not generate enough revenue to survive in its present form.   The Debtor has historically operated at a significant loss, even with tax revenue that supports the hospital. The cost of running a rural hospital can no longer be sustained based upon the changed demographics and needs of the community.   Second, the Debtor is simply running out of cash.   Again, even if Medicare and Medicaid reimbursements were immediately restarted, the Debtor would still not generate sufficient revenue to survive.   A new model of healthcare in the community is necessary.   Northwest Florida Healthcare, Inc. (the Buyer) operates a hospital in Chipley, Florida.   It is geographically well-situated to continue to operate the Debtor's healthcare clinic, has already hired some employees at the Chipley hospital, and will hire as many additional employees as is necessary to operate the Business, in the Buyer's sole discretion.   Additionally, the Buyer will use commercially reasonable efforts to identify a third party that will utilize the Debtor's hospital facility for new services such as a geriatric psychological facility or memory

care facility that is needed in the area and which may provide many jobs for the community.  In short, the Debtor does not have time or available cash to conduct a longer term sale process.  The Debtor submits that the proposed sale is the best alternative available under the facts and circumstances of this case and the sale will provide for the best possible alternative for the community and the Debtor's constituents and employees.

## RELIEF REQUESTED

### A.  Approval of Sale

18.     The Debtor requests entry of an order approving the Sale.

19.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  *See* 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").[3]

20.     To approve the use, sale, or lease of property outside the ordinary course of business, this Court need only determine that the Debtor's decision is supported by "some articulated business justification."  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc., et al. (In re Cont'l Air Lines, Inc.)* , 780 F.2d 1223, 1226 (5th Cir. 1986); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (holding that a debtor in possession can sell assets of his estate

---

[3] Section 1107(a) of the Bankruptcy Code provides debtors, as debtors in possession, the same authority as a trustee to use, sell, or lease property under section 363(b)(1).

outside the ordinary course of business if he has an articulated business justification); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Sarah's Tent, LLC*, 396 B.R. 571, 573 (Bankr. S.D. Fla. 2008) (Cristol, J.); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that a trustee must show that "there is a sound business purpose for conducting the sale prior to confirmation of a plan"); *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) ("[T]he Trustee has the burden to establish sound business reasons for the terms of the proposed sale"); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

21.     If a sound business reason exists, the law vests a debtor's decision to sell property out of the ordinary course of business with a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest, or gross negligence." *Id.*

22.     Ample business justification exists in this case to approve the sale of the Debtor's assets.  The Debtor has considered all alternatives, with the assistance of its advisors, and determined that the immediate sale of substantially all of its assets is in the best interests of its estate and creditors.  In order to preserve and maximize the value of the Debtor's assets, the

Debtor believes that the disposition of its assets must be completed in the timeframe described herein.

23.    The Sale serves a sound business purpose and should be approved.  The Debtor submits, based on the exercise of its business judgment, that the terms of the Sale are fair and reasonable.  Further, the Sale pursuant to section 363 of the Bankruptcy Code will return a greater benefit to the Debtor's estate and its creditors than any of the alternatives, including a sale at a later date or an immediate shut down.  The Assets have greater value to the Buyer than to any other potential purchaser, and the Sale allows for continued healthcare in some form and the prospect of significantly more services and jobs in the future.  The Debtor's license and Medicare Provider Number have significant negative issues associated with them, and the ability to transfer them may be impossible.  The proposed sale does not require the transfer of the Debtor's license or provider number.

24.    The prior settlement with PCH released liens and claims that are not otherwise being assumed as part of the closing by the Buyer, and the Debtor submits that the Real Property and Assets can be conveyed to the Buyer.

25.    The Debtor offers that there is some concern over Chapter 61-229 of the Laws of the State of Florida, which is attached hereto as **Exhibit "B"**.  This law would seem to limit the ability of the Debtor to sell the Real Property (although a long term lease would be permissible under such law).  The Debtor submits that this Court has the authority to authorize the sale of the Debtor's assets, including the Real Property.   Additionally, absent the sale, the Debtor will cease operating and close its doors.  The absurd result of not being able to convey the Real Property cannot be the intent of the law.

26.    The relevant Florida law contemplates that the Debtor Real Property will be operated as a hospital—the Campbellton-Graceville Hospital—under the guidance of the Board of Trustees for the Debtor.  The Debtor for its chapter 11 petition for multiple reasons and, based upon its present situation, it will, under any circumstance, wind down its operations and liquidate its assets for the benefit of its creditors and interested parties, the net result of which is that the Campbellton-Graceville Hospital will cease operations.  As set forth herein, the operation of a hospital and the expenses associated therewith are no longer viable, and the law contemplating the construction and operation of a hospital is no longer valid.  The law appears to authorize the Debtor to sell all of its assets, except for the Real Property. This restriction can be analogized to a restrictive covenant. As explained by Judge Olson in *In re Tousa, et al.*, 393 B.R. 920, 922 (Bankr. S.D. Fla. 2008), "a restrictive covenant generally creates an interest in property that would prevent me from permitting a § 363 sale free and clear of all liens, claims and encumbrances." *Id.* Judge Olson, however, noted that "unreasonable restraints on alienation of property are unenforceable," and that under Florida law, "[w]hen determining the validity of restraints on alienation, courts must measure such restraints in terms of their duration, type of alienation precluded, or the size of the class precluded from taking." *Id.* at 923 (citations and quotations from Florida case law omitted). Judge Olson further noted that "Florida case law provides that under certain circumstances the nature of a restrictive right is so impractical given material intervening events, that enforcing it would be unjust." *Id.* at 924. Here, such material intervening events, i.e., "changed circumstances", render enforcement of the apparent *permanent* prohibition on the sale of the Real Property untenable. As stated, the premise of the law forming the Debtor was to operate the Real Property as a hospital; given this bankruptcy filing and the ongoing wind-down, it is only a matter of time before the Campbellton-Graceville Hospital

ceases to function at all. Put simply, the bankruptcy filing and the pending wind-down constitute the ultimate "material intervening events" rendering the prohibition on the sale of the Real Property an "unreasonable restraint" such that the Debtor should be authorized to sell the Real Property, along with all of the other assets of the Debtor, free and clear of all interests, including the prohibition on the sale of the Real Property.  Case law discussed by Judge Olson supports this result. *See Port St. Joe Dock & Terminal Ry. Co. v. Maddox*, 140 Fla. 110, 191 So. 775 (1939); *Osius v. Barton*, 109 Fla. 556, 147 So. 862 (Fla. 1933).  Case law from other districts is in accord.  *See, e.g.*, *In re Daufskie Island Props., LLC*, 431 B.R. 626, 644 (Bankr. D. S.C. 2010) (applying South Carolina law, relying upon Judge Olson's decision in *Tousa*).  Additionally, the United States Bankruptcy Court for the Central District of California in *Gardens Regional Hospital and Medical Center, Inc.* recently issued an opinion that would also support the sale of the Real Property to the Buyer.   A copy of the opinion is attached hereto as **Exhibit "C."**

27.    The Buyer has also requested that the Debtor obtain the consent of the Florida Attorney General and the Jackson County Board of County Commissioners.   Such approvals are being pursued.

28.    Based on the foregoing, the Debtor submits that the proposed Sale is in the best interest of the Debtor, its estate and creditors, and is based upon sound, reasoned, and informed business judgment warranting this Court's approval.

## B.  Elimination of 14 Day Stay

29.    Pursuant to Rule 6004(h) of the Bankruptcy Rules, unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.

30.    The Debtor submits that the exigent financial circumstances and the need to provide continuous healthcare to the community constitutes cause to permit an immediate closing and a waiver of the 14-day stay period.

31.    The Debtor requests that, in order to expedite the Sale, the Court waive the requirement that any order approving the Sale be stayed for 14 days as required by Federal Rule of Bankruptcy Procedure Rule 6004(h).

### C.    Good Faith Finding

32.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, Case No. 92 CIV. 7054 (PKL), 1993 WL 159969, *3 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes,* 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

33.    The selection of any purchaser or agent for the disposition of the Debtor's assets will be the product of arm's-length, good-faith negotiations in an anticipated competitive purchasing process.  The Debtor intends to request at the hearing to consider approval of the sale a finding that the Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### D.  Shortening Notice Period

34.    Pursuant to Bankruptcy Rule 6004(a), notice of the proposed sale of property outside the ordinary course of business is to be provided in accordance with Bankruptcy Rule 2002(a)(2), (c)(1), and (k).  These provisions of Bankruptcy Rule 2002 provide, in part, that all creditors are to receive at least 21 days notice of a sale of estate assets outside the ordinary course of business, unless the court, for cause, shortens the time or directs another method of giving notice.  Fed. R. Bankr. P. 2002(a)(2).  Relevant here, Bankruptcy Rule 2002(c)(1) provides that the notice of the proposed sale of assets is to include a general description of the assets, the terms and conditions of any private sale, and the time fixed for filing objections.  Fed. R. Bankr. P. 2002(c)(1).

35.    The Debtor will provide notice of this Motion and the proposed sale of the Assets to all creditors listed on the matrix filed with the Court.  The Debtor requests that the notice period be shortened to correspond with the hearing date.

### E.  Assumption and Assignment of Certain Unexpired Leases

36.    Section 365(a) of the Bankruptcy Code allows the Debtor to maximize the value of the Debtor's estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not.  *See COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008).  Section 365 of the Bankruptcy Code authorizes

the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(f)(2).

37.    The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" through "consideration of the facts of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (*quoting Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001)); *see also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

38.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding chief determinant of adequate assurance is whether rent will be paid). *See In re Vitanza*, Case No. 98-19611DWS, 1998 WL 808629, at *26 (Bankr. E.D. Pa. Nov. 13, 1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.")    In addition, where the leased premises are in a shopping center, a debtor assigning such lease must meet the heightened definition of adequate assurance of future performance in section 365(b)(3) to ensure that "[t]he

essential terms of a debtor's lease in a shopping center [are] not . . . changed in order to facilitate assignment." *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (internal quotations and citations omitted).

39.     The Debtor has advised that all of the Assumed Contracts are current and that there are no Cure Costs to be paid.

40.     The Debtor believes that the assumption of the Assumed Contracts and their assignment to the Buyer presents the best option for the Debtor in terms of (i) eliminating administrative expense claims, (ii) facilitating a section 363 sale of the Debtor's Assets to Buyer, and (iii) maximizing the value of the Assets for the benefit of all creditors and stakeholders of the Debtor.

41.     Accordingly, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of the estate and creditors, and should be granted in all respects.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter a Sale Order:

(a)     approving the sale of the Assets to the Buyer, free and clear of all liens, claims, and encumbrances, as outlined above;

(b)     determining that Chapter 61-229 of the Laws of the State of Florida does not prohibit the Debtor from selling the Assets, including, but not limited to, the Real Property;

(c)     determining that the Buyer is a "good faith purchaser" subject to the protections of 11 U.S.C. § 363(m) and the Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code;

(d)     authorizing the Debtor to assume and assign the Assumed Contracts to the Buyer;

(e)    authorizing the Debtor to sign any documents that are necessary to close the sale;

(f)    waiving the FRBP 6004(h) fourteen-day notice period after the entry of an order approving the sale;

(g)    shortening the time for notice as required under FRBP 2002; and

(h)    awarding such other and further relief that this Court deems just and proper.

Dated:  July 5, 2017                    Respectfully submitted,

                                        BERGER SINGERMAN LLP
                                        *Counsel for Debtor*
                                        313 North Monroe Street, Suite 301
                                        Tallahassee, FL 32301
                                        Tel. (850) 561-3010
                                        Fax (850) 561-3013

                                        By: */s/   Brian G. Rich*_____
                                            Brian G. Rich
                                            Florida Bar No. 38229
                                            brich@bergersingerman.com


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on the 5th day of July, 2017, by electronic transmission through the Court's CM/ECF system upon all parties on the attached CM/ECF Service List

                                        */s/   Brian G. Rich*_____
                                        Brian G. Rich

## CM/ECF SERVICE LIST

- Daniel Charles Curth    danc@goldmclaw.com,
  mattm@goldmclaw.com;haroldi@goldmclaw.com;seanw@goldmclaw.com
- Michael Patrick Dickey    mdickey@barronredding.com, chodges@barronredding.com
- Jason H. Egan    jason.h.egan@usdoj.gov
- Nicole Mariani Noel    bankruptcynotices@kasslaw.com, nmnoel@ecf.courtdrive.com
- Brian G. Rich    brich@bergersingerman.com,
  efile@bergersingerman.com;bwalter@bergersingerman.com;sfulghum@bergersingerman
  .com;efile@ecf.inforuptcy.com
- Frank Paul Terzo    fterzo@broadandcassel.com, jphillips@broadandcassel.com
- United States Trustee    USTPRegion21.TL.ECF@usdoj.gov
- Adam M Walters    awalters@walterslawpc.com
- Alan Weiss    alan.weiss@hklaw.com,
  Brenda.reece@hklaw.com;lynette.mattison@hklaw.com

# EXHIBIT "A"

June 29, 2017

**VIA EMAIL AND HAND DELIVERY**

Campbellton-Graceville Hospital Corporation
C/O Marshall Glade, Chief Restructuring Officer
5429 College Drive
Graceville, FL 32440

RE:     **Letter of Intent to Purchase Certain Assets of Campbellton-Graceville Hospital Corporation and its Subsidiaries and Affiliates**

Dear Mr. Glade:

Northwest Florida Healthcare, Inc., a Florida corporation ("Buyer"), is pleased to submit the following letter of intent (the "Letter of Intent") with respect to the acquisition of certain assets owned or used by Campbellton-Graceville Hospital Corporation, a Florida corporation ("Seller") in the operation of the hospital and clinic located at the Real Property (the "Business") (the transaction described herein is referred to as the "Sale Transaction").

Buyer is submitting this Letter of Intent to you as the Chapter 11 trustee (the "Chapter 11 Trustee") of Seller appointed pursuant to an order of the United States Bankruptcy Court for the Northern District of Florida (the "Bankruptcy Court") in the Chapter 11 bankruptcy case styled *In re Campbellton-Graceville Hospital Corporation*, Case No. 17-40185-KKS (the "Bankruptcy Case").

Upon acceptance on behalf of Seller by the Chapter 11 Trustee, this Letter of Intent will evidence the mutual intent of Buyer, Seller and the Chapter 11 Trustee to proceed with negotiations intended to carry out a transaction substantially in the manner outlined in this Letter of Intent. Upon acceptance and subject to Buyer's compliance with the terms and conditions contained herein, Buyer shall be bound to complete the Sale Transaction on terms and with the conditions substantially in the form described herein.

The contemplated terms and conditions of the Sale Transaction include, but are not limited to, the following:

1.      **Bankruptcy Court Approval of Sale Transaction.** The Chapter 11 Trustee, Seller and Buyer further acknowledge that, on May 5, 2017, Seller filed a voluntary petition for relief under Title 11 of the United States Code in the Bankruptcy Court on behalf of Seller, thereby commencing the Bankruptcy Case. Buyer will only purchase the Assets (defined hereafter) if the Sale Transaction is approved by an order of the Bankruptcy Court pursuant to 11 U.S.C. §§363 and 365 in the Bankruptcy Case (which order will be acceptable to Buyer, in its sole and absolute discretion).

2.      **Assets to be Purchased**. Buyer, through subsidiaries newly-formed by Buyer prior to the Closing (as defined below), shall acquire certain assets of Seller (the "Assets"), free and clear of any and all liens, claims, encumbrances and interests. The Assets which shall be described in more detail in the Definitive Agreement (defined below) will include, without limitation, all real property and improvements thereon of Seller, all real property associated with the Business; all equipment, tools, furniture, fixtures, motor vehicles, inventory, work product, books and records, and all other tangible personal property other than the Excluded Assets, as defined below; all intellectual property (including,

but not limited to, trade names, trademarks, copyrights, patents, licenses, data, software, domain names, and website content to the extent the Seller is able to transfer such intellectual property, using his best efforts), patient lists, medical records, and goodwill; all rights and causes of action relating to the Assets; and all other intangible and tangible property owned by Seller and/or used in, associated with, or necessary to operate the Business. Prior to the Closing, Buyer may determine, on a case-by-case basis within Buyer's sole and absolute discretion, whether to acquire or not acquire any specific Asset that is leased or encumbered by any indebtedness, lien, encumbrance, or other obligation. Notwithstanding the foregoing, Buyer shall acquire title to, and ownership of, the real property located at 5429 College Drive, Graceville, Florida 32440 (the "Real Property") and shall assume the outstanding indebtedness currently encumbering the Real Property which, as of the date of this Letter of Intent, is approximately $420,000.00 in the aggregate (the "Assumed Indebtedness"). "Excluded Assets" shall mean (a) those seven items of medical equipment on the premises of the hospital the purchase of which was financed by General Electric and that are subject to liens in favor of General Electric; (b) the cash, cash equivalents, and accounts receivable of Seller; and (c) Causes of Action, including Chapter 5 Avoidance Actions.

3. **Leases and Executory Contracts.** Seller shall, pursuant to 11 U.S.C. §365, assume and assign to Buyer any and all executory contracts and unexpired leases of Seller utilized in the Business as Buyer, in its sole and absolute discretion, designates, but excluding the executory contracts associated with the Excluded Assets (the "Assumed Contracts"). Buyer will not assume any pre-Closing obligations or liabilities of Seller under the Assumed Contracts, such as cure payments or other amounts arising upon assumption pursuant to 11 U.S.C. §365. All such cure obligations relating to the Assumed Contracts shall be paid by Seller at Closing. Buyer will identify and designate the Assumed Contracts two (2) business days prior to the hearing before the Bankruptcy Court to approve the Sale Transaction. In no event will Buyer assume any of Seller's provider agreements with third party payors, and Buyer shall have no obligations or any liability with respect to those provider agreements.

4. **Purchase Price.** The purchase price for the Sale Transaction will be the principal balance of the Assumed Indebtedness as of the date of Closing (the **"Purchase Price"**). The Purchase Price shall be satisfied by the assumption of the Assumed Indebtedness.

5. **Assumption of Liabilities.** With the exception of post-Closing obligations under the Assumed Contracts and the Assumed Indebtedness, Buyer will assume no liabilities or other obligations, commercial or otherwise, of Seller, known or unknown, fixed or contingent, liquidated or unliquidated, secured or unsecured, or otherwise, regardless of when the same may arise or may have arisen.

6. **Due Diligence.** From the date hereof and continuing until the Closing, Seller will afford Buyer's employees, auditors, legal counsel, and other authorized representatives all reasonable opportunity and access during normal business hours, or as otherwise agreed between the parties, to inspect, investigate, and audit the assets, liabilities, contracts, operations and business of Seller.

7. **Definitive Agreement.** Consummation of the Sale Transaction will be subject to the negotiation and execution of a definitive agreement (the "Definitive Agreement") no later than five (5) business days prior to the Sale Hearing (as defined below), with terms satisfactory to Seller and Buyer and which, among other things, reflect the provisions summarized herein. This Letter of Intent does not set forth all of the matters upon which agreement must be reached in order for the Sale Transaction to be consummated.

8. **Title to Assets.** Except with respect to the Assumed Indebtedness, the Definitive Agreement shall provide that Seller will transfer to Buyer all right, title, and interest of Seller in and to the Assets, free and clear of any and all claims, liens, encumbrances, mortgages, charges, security interests, restrictions or any other interests or imperfections of title whatsoever.

2

9.      **Employees.** The Definitive Agreement shall provide that, as of the Closing of the Sale Transaction, Seller will terminate all of its employees who are involved in the operation of the Business. It is anticipated that Buyer may make offers of employment to certain employees of Seller as of the date of Closing. Such offers of employment would be on terms and conditions acceptable to Buyer in Buyer's sole discretion. Buyer shall not be responsible for any obligations of Seller under the Worker Adjustment and Retraining Notification Act, as amended, or any similar state or local statute or any accrued but unpaid payroll, employee benefit obligation or other employee obligations of Seller.  Notwithstanding anything to the contrary set forth herein, Buyer shall use commercially reasonable efforts to staff the healthcare clinic to be operated after the Closing at the Real Property with employees who are residents of Jackson County, Florida and who are appropriately educated, experienced, trained, and, as applicable, credentialed.  Priority in hiring will be given to former employees of the hospital associated with the Business where practical.

10.     **Closing.** The closing of the Sale Transaction (the "Closing") will be subject to mutually agreeable conditions, which shall include the following:

   a.   The Board of County Commissioners for Jackson County, Florida (or such other relevant governmental authority) shall approve a plan abating any and all property taxes that are due and payable with respect to the Real Property or any improvements that currently exist or may exist in the future from the date of the Closing through December 31, 2022;

   b.   The absence of any material adverse change in the Business, the Assets, the Assumed Contracts, or in the financial condition, results of operations, assets, properties, or prospects of the Business, subject to the acknowledgment by the Buyer of Seller's pending financial difficulties and the likely shutdown of the hospital operations;

   c.   Compliance by the Seller with applicable laws, regulations, rules, and other binding governmental authorities;

   d.   Obtaining the necessary consents and/or approvals and/or releases of governmental bodies, lenders, lessors, and other third parties;

   e.   Except for the Bankruptcy Case and claims asserted against the Seller in the Bankruptcy Case and pending litigation, the absence of pending or threatened litigation regarding the Business, the Assets, the Assumed Contracts, or the Definitive Agreement;

   f.   Completion of Buyer's complete and full due diligence investigation, the results of which shall be acceptable to Buyer, within Buyer's sole and absolute discretion;

   g.   Delivery of the Definitive Agreement, closing certificates and other documentation as required by Buyer necessary to consummate the Sale Transaction;

   h.   Delivery of a letter approving or consenting to the Sale Transaction issued by the Office of the Attorney General of the State of Florida (the "Attorney General") or a written opinion from the Attorney General that Chapter 86-455 of the Laws of Florida does not prohibit the consummation of the Sale Transaction in such form as is acceptable to Buyer, within Buyer's sole and absolute discretion;

   i.   Delivery of a letter approving or consenting to the Sale Transaction issued by the Board

3

of County Commissioners for Jackson County, Florida in such form as is acceptable to Buyer, within Buyer's sole and absolute discretion;

j.   The termination of the operations of the hospital associated with the Business prior to the Closing of the Sale Transaction; and

k.   The entry of the Sale Order (defined below), and the order approving the assumption and assignment of certain Assumed Contracts by the Bankruptcy Court in form and substance satisfactory to Buyer, in Buyer's sole and absolute discretion.

Buyer may waive the pre-Closing satisfaction of any of the foregoing conditions; *provided, however*, that such waiver must be in a writing signed by an authorized representative of Buyer in order to be effective. If the conditions set forth in Section 10(h) or Section 10(i) have not been met or waived prior to Seller's cessation of the operations of the healthcare clinic located at the Real Property, Seller may terminate this Letter of Intent upon thirty (30) days prior written notice to Buyer; *provided, however*, that Seller's termination of this Letter of Intent shall be void and not be effective if, during the thirty (30) day notice period, the conditions set forth in Section 10(h) or Section 10(i) are satisfied or waived by Buyer.

Seller shall provide not less than ten (10) days prior written notice to Buyer if Seller intends to cease the operations of the healthcare clinic located at the Real Property, and in the event that Seller provides such notice, Seller and Buyer shall use their best efforts and shall act in good faith to negotiate and execute a management agreement on terms and conditions that are acceptable to Buyer, within Buyer's sole and absolute discretion, that authorizes Buyer to continue the operations and management of the healthcare clinic located at the Real Property prior to the Closing until a Sale Transaction is consummated to ensure the continuous availability of healthcare services in Graceville.

**11.    Post-Closing Covenants.**   The Definitive Agreement will include the following post-Closing covenants, which shall be binding on Buyer:

a.   Buyer shall use commercially reasonable efforts to operate a healthcare clinic at the Real Property at least five calendar days during each calendar week for a minimum of one year from the date of the Closing; provided, however, that in the event that the taxing district in which the Business operates provides $400,000 of tax credits to Buyer for the purpose of operating the healthcare Clinic at the Real Property, then Buyer will expand the hours of operation of the clinic to no less than ten hours per day on week-days and six hours per day on Saturdays and Sundays;

b.   Buyer shall maintain the patient medical records of the hospital pursuant to all applicable laws and requirements;

c.   Upon at least two business days prior written notice, Buyer will provide Seller and its representatives reasonable access to books and records of the Business during normal business hours for purposes of prosecuting or defending any litigation related to the Business and as necessary for the winding down and dissolution of Seller; and

d.   Buyer shall use its commercially reasonable efforts to repurpose the existing hospital facility located at the Real Property such that the existing hospital facility can be used for healthcare purposes.

**12.    Sale Order.**   Within five (5) business days of the acceptance of this Letter of Intent by the Seller, the Seller shall file a motion, supporting papers, and a form of order, in form and substance

satisfactory to Buyer, with the Bankruptcy Court seeking the entry of an order approving the Sale Transaction (the "Sale Order"), which shall be approved within twenty-one days (21) days thereafter. The Sale Order approving the Sale Transaction entered by the Bankruptcy Court under 11 U.S.C. §363 shall be in form and substance satisfactory to Buyer, in its sole and absolute discretion; shall be entered no later than September 30, 2017; and shall also provide, without limitation, that:

   a. The Sale Transaction is or will be a legal, valid, enforceable, and effective transfer of the Assets to Buyer;

   b. The Sale Transaction vests or will vest Buyer with good title to the Assets, which, except with respect to the Assumed Indebtedness, will be free and clear of all liens, claims, or encumbrances;

   c. The Sale Transaction constitutes reasonably equivalent value and fair consideration for the Assets being purchased;

   d. The Sale Transaction does not and will not subject Buyer to any liability by reason of such transfer under the laws of the United States, any State, or Commonwealth, territory, possession or the District of Columbia based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor or transferee liability;

   e. The leases and executory contracts of Seller designated by Buyer prior to the Sale Hearing date shall be assumed and assigned to Buyer as of the date of Closing pursuant to 11 U.S.C. §365;

   f. Buyer shall be found by the Bankruptcy Court to be a good faith purchaser of the Assets, as that term is used in 11 U.S.C. §363(m); and

   g. The United States of America and any other federal, state, or local agencies have consented to the Sale Transaction and provided the representations and warranties set forth above and in the Sale Order, as applicable.

   **13.    Releases and Statements.** Except as required by law, the timing and content of any public disclosure regarding this letter of intent or the Definitive Agreement shall be made only upon the approval of Buyer.

   **14.    Governing Law; Venue.** This letter of intent shall be governed by the laws of the State of Florida, its rules of conflict of laws notwithstanding. The parties agree and consent to the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Florida in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Letter of Intent. Each party hereby irrevocably consents to the service of any and all process in any such suit, action, or proceeding by registered or certified mail addressed and sent to the chief executive officer of such party at such party's main or central office.

   **15.    Counterparts.** This Letter of Intent may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Electronic copies of signatures shall be treated as originals for all purposes.

   **16.    Headings.** The heading references herein are for convenience only, do not constitute a part of this Letter of Intent, and shall not limit or affect any provision hereof.

**17.    Expenses**.  Each party will bear its own legal, accounting, and other fees and expenses incurred in connection with the Sale Transaction, whether or not a Definitive Agreement is executed or the Closing of the Sale Transaction occurs.

**18.    Prior Agreements.** This expression of interest contains the entire agreement by and among the parties to date with respect to the subject matter hereof and supersedes any and all prior agreements and understandings, oral or written, with respect to such matters.

**19.    Binding Provisions**.  Except with respect to the provisions of **Sections 13-19**, which shall be legally binding on the parties upon their execution and delivery hereof, this Letter of Intent is an expression of intent only. The statements of intent or understanding contained herein shall not be deemed to constitute any offer, acceptance, or legally binding agreement, and such statements do not create any rights or obligations for, or on the part of, any party.

We look forward to working with you towards a successful transaction. If the foregoing meets with your approval, please indicate your acceptance by signing and returning the accompanying copy of this letter to us no later than June 30, 2017.

Very truly yours,

**NORTHWEST FLORIDA HEALTHCARE, INC.**

Michael Kozar, Chief Executive Officer

Accepted this _____ day of June, 2017.

**CAMPBELLTON-GRACEVILLE HOSPITAL CORPORATION**

By:    _____
Name:    Marshall Glade
Title:    Chief Restructuring Officer

17.    **Expenses**.  Each party will bear its own legal, accounting, and other fees and expenses incurred in connection with the Sale Transaction, whether or not a Definitive Agreement is executed or the Closing of the Sale Transaction occurs.

18.    **Prior Agreements.**  This expression of interest contains the entire agreement by and among the parties to date with respect to the subject matter hereof and supersedes any and all prior agreements and understandings, oral or written, with respect to such matters.

19.    **Binding Provisions**.  Except with respect to the provisions of **Sections 13-19**, which shall be legally binding on the parties upon their execution and delivery hereof, this Letter of Intent is an expression of intent only. The statements of intent or understanding contained herein shall not be deemed to constitute any offer, acceptance, or legally binding agreement, and such statements do not create any rights or obligations for, or on the part of, any party.

We look forward to working with you towards a successful transaction. If the foregoing meets with your approval, please indicate your acceptance by signing and returning the accompanying copy of this letter to us no later than June 30, 2017.

Very truly yours,

**NORTHWEST FLORIDA HEALTHCARE, INC.**

Michael Kozar, Chief Executive Officer

Accepted this ___29th___ day of June, 2017.

**CAMPBELLTON-GRACEVILLE HOSPITAL CORPORATION**

By:    _____
Name:    Marshall Glade
Title:    Chief Restructuring Officer

6

# EXHIBIT "B"

and to agree to repurchase such property upon the expiration of the contract, agreement, or lease; providing an effective date.

Be It Enacted by the Legislature of the State of Florida:

Section 1. Section 17 is added to chapter 61-2290, Laws of Florida, as amended, to read:

Section 17. In order to enhance the quality of health care services received by the citizens and residents of Jackson County and the Campbellton-Graceville Hospital District, and to ensure that said health care services are delivered more efficiently, the Board of Trustees of the Campbellton-Graceville Hospital Corporation, for the purpose of operating the Campbellton-Graceville Hospital and any of its facilities of whatsoever kind and nature, shall have the authority to enter into contracts, agreements, and leases with corporations either for profit or not for profit, duly authorized to do business in the state. By resolution, the Board of Trustees of the Campbellton-Graceville Hospital Corporation may elect to enter into such contracts or agreements and may elect to lease the capital facilities of the Campbellton-Graceville Hospital and all of its assets, including real property, improvements, accounts receivable, choses in action, standing accounts and indebtedness, fixtures, equipment, and other chattels, if the board of trustees of the hospital corporation finds that such contracts, agreements, or lease will advance the quality of health care in Jackson County or will ensure that said health care services are delivered more efficiently. In connection with such contract, agreement, or lease, the board of trustees of the hospital corporation is authorized to sell the personal property of the hospital to the corporation entering into said contract, agreement, or lease and it is further authorized to enter into a contract or agreement for the repurchase of the personal property upon the expiration of the contract, agreement, or lease. The term of any contract, agreement, or lease and the conditions, covenants, and agreements to be contained therein shall be mutually determined by the board of trustees of the hospital corporation and the contracting or leasing corporation. However, no such contract, agreement, or lease shall contain any condition, covenant, or agreement which is intended to or has the effect of reducing the level of health care services and benefits provided for in chapter 61-2290, Laws of Florida, which shall include indigent health care services.

Section 2. This act shall take effect upon becoming a law.

Approved by the Governor July 1, 1986.

Filed in Office Secretary of State July 1, 1986.

------

## CHAPTER 86-456

### House Bill No. 1149

An act relating to Citrus County, Homosassa Special Water District; amending section 1 of chapter 59-1177, Laws of Florida, as amended, increasing the territorial limits of the district; providing for a referendum in the existing

315

# EXHIBIT "C"

# FOR PUBLICATION



FILED & ENTERED

MAY 15 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Gardens Regional Hospital and<br>Medical Center, Inc.,<br>Debtor. | Case No.:   2:16-bk-17463-ER<br><br>Chapter:   11<br><br>**MEMORANDUM OF DECISION**<br>**FINDING THAT THE DEBTOR IS NOT**<br>**REQUIRED TO OBTAIN THE CONSENT**<br>**OF THE CALIFORNIA ATTORNEY**<br>**GENERAL TO SELL THE ASSETS OF A**<br>**CLOSED HOSPITAL**<br><br>Date:   May 3, 2017<br>Time:   10:00 a.m.<br>Location:   Courtroom 1568<br>Roybal Federal Building<br>255 East Temple Street<br>Los Angeles, CA 90012 |

At issue is whether the Debtor, a non-profit entity, is required to obtain the consent of the California Attorney General to sell certain assets of a closed hospital.[1] Under the relevant California statutes, a non-profit entity operating a "health facility" that wishes to sell a material amount of its assets must obtain the consent of the California Attorney General. Because a closed hospital does not qualify as a "health facility" under California law, the Court finds that the Debtor is not required to obtain the California Attorney General's consent prior to selling a material amount of its assets.

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and General Order No. 13-05 of the U.S. District Court for the Central District of California.

## I. Facts

Gardens Regional Hospital and Medical Center, Inc. (the "Debtor") commenced a voluntary Chapter 11 petition on June 6, 2016. As of the petition date, the Debtor operated a 137-bed acute care hospital located in Hawaiian Gardens, California (the "Hospital"). The Hospital contained an intensive care unit, a cardiac unit, and an eight-bed Emergency Department. In 2015, more than 8,500 patients visited the Emergency Department, and the Hospital had a total of more than 2,850 admissions. The Hospital served a high number of indigent patients and was designated as Disproportionate Share Hospital by the United States Department of Health and Human Services in connection with the Medicaid program. Disproportionate Share Hospitals receive payments from the Centers for Medicaid and Medicare Services to cover the costs of providing care to uninsured patients. The Debtor operated the Hospital as a non-profit entity.

On July 28, 2016, the Court approved the sale of the operating Hospital to Strategic Global Management, Inc. ("Strategic"), a for-profit entity, for consideration of approximately $19.5 million. Strategic assigned its rights under the Asset Purchase Agreement (the "APA") to KPC Global Management, LLC ("KPC"). Pursuant to Cal. Corp. Code § 5914(a) (West 2017), which requires a non-profit entity operating a health facility to obtain approval from the California Attorney General (the "Attorney General") when selling a material amount of its assets to a for-profit entity, the Debtor requested that the Attorney General authorize the sale. On November 18, 2016, the Attorney General approved the sale, but only on the conditions that Strategic and KPC (1) provide $2.25 million per year in charitable care for six years, (2) provide approximately $860,000 in community benefit services per year for six years, and (3) assume at least $2.4 million in liability under the Hospitality Quality Assurance Fee Program ("HQAF"). The $2.25 million charity care condition was particularly challenging for Strategic and KPC, as the Hospital had provided only approximately $500,000 in charity care in 2015. The conditions imposed by the Attorney General increased Strategic and KPC's acquisition cost by approximately $21 million.

On December 5, 2016, Strategic, the Debtor, and representatives of two unions representing the Debtor's employees met with representatives of the Attorney General to request modification of the conditions. On December 16, 2016, the Attorney General's office issued a letter stating that the conditions would not be modified. On January 9, 2017, after negotiating with Strategic, the Debtor proposed to the Attorney General a modified transaction, under which Strategic and KPC would continue operating the hospital and would assume at least $2.4 million in HQAF liability, but only if the charity care requirement was reduced to $500,000 annually. On January 11, 2017, the Attorney General's office issued a letter stating that it lacked the authority to modify the charitable care condition that it had imposed. On January 6, 2017, Strategic and KPC provided the Debtor formal notice that, in view of the conditions imposed by the Attorney General, they were exercising their option under APA to terminate the transaction.

By this point in the case, the Debtor had nearly exhausted the $3.13 million in debtor-in-possession financing it had obtained, and the lack of unencumbered assets made it impossible for the Debtor to obtain additional financing. The Hospital continued to operate at a loss, and the Debtor was on the verge of running out of cash. In view of these circumstances, on January 20, 2017, the Court granted the Debtor's emergency motion to close the Hospital. The Court found that in voting to close the Hospital, the Debtor's Board of Directors had acted in accordance with the Debtor's mission of sustaining public health and welfare, as health and welfare would be jeopardized if the Hospital continued to admit new patients when it lacked the funds to

adequately sustain operations. As of February 2, 2017, all patients in the Hospital had been discharged or relocated, and the Hospital was completely closed.

After the Hospital closed, the Debtor caused its general acute care hospital license to be placed in suspense, pursuant to Cal. Health & Safety Code § 1300(a) (West 2017).[2] A license placed in suspense may be reinstated, but only if the applicant demonstrates compliance with the requirements of Cal. Health & Safety Code § 1265. Reinstatement requires the applicant to submit, among other things, satisfactory evidence of its reputable character and its ability to comply with applicable health and safety regulations. *See* Cal. Health & Safety Code § 1265(e)–(f).

The Debtor now moves to sell the following assets of the closed Hospital (collectively, the "Assets"):

- The below-market lease to the building in which the Hospital formerly operated (the "Hospital Lease").
- The suspended hospital license, and licenses and permits relating to the pharmacy and laboratory.
- Any furniture, fixtures, and equipment at the premises that are not owned by the landlord under the Hospital Lease.
- Inventory and supplies (which have negligible value).
- Books and records.

The sale does not include the Debtor's cash and cash equivalents, accounts receivable, Medicare and Medi-Cal provider agreements, real property leases other than the Hospital Lease, or claims and causes of action against third parties. The purchaser, American Specialty Management Group ("American Specialty"), intends to seek reinstatement of the Hospital's suspended license, and open a new general acute care hospital on the premises.

The Debtor asserts that it is not required to obtain the consent of the Attorney General to sell the Assets. The Debtor's theory is that because the Hospital has closed, the Assets no longer qualify as a "health facility." As a result, the Debtor asserts, the Attorney General lacks authority to review the sale under Cal. Corp. Code § 5914(a). The Attorney General disagrees, maintaining that the Assets still constitute a "health facility" even though the Hospital is not operating. According to the Attorney General, a finding that Cal. Corp. Code § 5914(a) does not apply would enable other non-profit entities to temporarily cease operations for the purpose of selling their assets free of the Attorney General's review and consent. Such sales, the Attorney General contends, would jeopardize public welfare by allowing assets intended for charitable purposes to be acquired by for-profit entities without proper oversight.

## II. Discussion

Section 363(d)(1)[3] authorizes non-profit entities, such as the Debtor, to sell estate assets only if the sale is "in accordance with nonbankruptcy law applicable to the transfer of property by" a non-profit entity. Section 541(f) similarly provides that property held by debtors that are § 501(c)(3) corporations under the Internal Revenue Code may be transferred, but "only under the

---

[2] Cal. Health & Safety Code § 1300(a) provides in relevant part: "Any licensee or holder of a special permit may, with the approval of the state department, surrender his or her license or special permit for suspension or cancellation by the state department."

[3] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

same conditions as would apply if the debtor had not filed a case under this title." Section 363(b) permits the debtor to sell estate property out of the ordinary course of business, subject to court approval. The debtor must articulate a business justification for the sale. *In re Walter*, 83 B.R. 14, 19–20 (9th Cir. BAP 1988). Whether the articulated business justification is sufficient "depends on the case," in view of "all salient factors pertaining to the proceeding." *Id.* at 19–20. Section 363(f)(1) provides that a sale of estate property may be "free and clear of any interest in such property of an entity other than the estate, only if applicable nonbankruptcy law permits sale of such property free and clear of such interest …."

## A. The Attorney General's Alleged Authority to Review the Sale is an "Interest in Property," and the Assets May Be Sold Free and Clear of That Interest

Pursuant to § 363(b) and (f)(1), the Court approves the sale of the Assets free and clear of the Attorney General's claim that he may impose conditions upon the terms of the sale or the use of the Assets after the sale. Applicable nonbankruptcy law permits the sale of the Assets absent the consent or review of the Attorney General. As explained below, because the Assets do not qualify as a "health facility" under California law, the Debtor is not required to obtain the Attorney General's consent to sell the Assets. In addition, the Attorney General's contention that he is entitled to impose conditions upon the sale, including monetary conditions, constitutes an "interest in … property" of which the Assets may be sold free and clear.

The Bankruptcy Code does not define the phrase "interest in … property" for purposes of § 363(f). The Third Circuit has held that the phrase "interest in … property" is "intended to refer to obligations that are connected to, or arise from, the property being sold." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 259 (3d Cir. 2000). That conclusion is echoed by *Collier on Bankruptcy*, which observes a trend in caselaw "in favor of a broader definition [of the phrase] that encompasses other obligations that may flow from ownership of the property." 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 363.06[1] (16th ed. 2017).

Courts have held that interests in property include monetary obligations arising from the ownership of property, even when those obligations are imposed by statute. For example, in *Mass. Dep't of Unemployment Assistance v. OPK Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860 (B.A.P. 1st Cir. 2013), the court held that taxes assessed by Massachusetts under its unemployment insurance statutes constituted an "interest in … property." The taxes were computed based on the Debtor's "experience rating," which was determined by the number of employees it had terminated in the past. *Id.* at 862. Because the Debtor had terminated most of its employees prior to selling its assets, its experiencing rating, and corresponding unemployment insurance tax liabilities, were very high. *Id.* The *PBBPC* court held that the experience rating was an interest in property that could be cut off under § 363(f). *Id.* at 869–70. Similarly, in *United Mine Workers of Am. Combined Benefit Fund v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 581, the court held that monetary obligations imposed by the Coal Industry Retiree Health Benefit Act of 1992 constituted an "interest in … property" within the meaning of § 363(f).

Here, the Attorney General takes the position that California law empowers him to require the purchaser of the Assets to agree to certain monetary obligations, such as furnishing a specified amount of charitable care. The charitable care obligations are connected to and arise from the Assets being sold. Had the Assets not originally been earmarked for charitable purposes, the Attorney General could not seek to impose continuing charitable care obligations. The Attorney General's claim to regulatory authority is similar to the regulatory interests

asserted in *PBBPC* and *Leckie Smokeless Coal*, and therefore constitutes an "interest in ... property" for purposes of § 363(f).

## B. Applicable Nonbankruptcy Law Does Not Require the Debtor to Obtain the Attorney General's Consent to Sell the Assets

Cal. Corp. Code § 5914(a) provides in relevant part:

> Any nonprofit corporation that ... operates or controls a health facility, as defined in Section 1250 of the Health and Safety Code, or operates or controls a facility that provides similar health care, shall be required to provide written notice to, and to obtain the written consent of, the Attorney General prior to entering into any agreement or transaction to ... [s]ell ... its assets to a for-profit corporation or entity ... when a material amount of the assets of the nonprofit corporation are involved in the agreement or transaction.

Cal. Health & Safety Code § 1250 defines a "health facility" as

> a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation and including care during and after pregnancy, or for any one or more of these purposes, for one or more persons, to which the persons are admitted for a 24-hour stay or longer ....

The parties have not identified, and the Court has been unable to locate, any decisions by California courts addressing the applicability of Cal. Corp. Code § 5914(a) and Cal. Health & Safety Code § 1250 to a closed hospital. Accordingly, the Court is required to interpret these statutes applying California's rules of statutory construction. *See Fed. Sav. & Loan Ins. Corp. v. Butler*, 904 F.2d 505, 510 (9th Cir. 1990) (applying California's rules of statutory construction to interpret Cal. Civ. Proc. Code § 877).

Under California law, the "ultimate task" in statutory interpretation "is to ascertain the Legislature's intent." *People v. Massie*, 19 Cal.4th 550, 569, 79 Cal.Rptr.2d 816, 967 P.2d 29 (1998). "Ordinarily, the words of the statute provide the most reliable indication of legislative intent." *Pac. Gas & Elec. Co. v. Cty. of Stanislaus*, 16 Cal.4th 1143, 1152, 69 Cal.Rptr.2d 329, 947 P.2d 291 (1997). Only where the statutory language is ambiguous may the Court consider "evidence of the Legislature's intent beyond the words of the statute," such as the "statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality ...." *Hughes v. Bd. of Architectural Examiners*, 17 Cal.4th 763, 776, 952 P.2d 641 (1998). "When statutory language is ... clear and unambiguous there is no need for construction, and *courts should not indulge in it*." *Delaney v. Superior Court*, 50 Cal.3d 785, 800, 268 Cal.Rptr. 753, 789 P.2d 934 (1990) (emphasis in original). However, the "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." *Younger v. Superior Court*, 21 Cal.3d 102, 113, 145 Cal.Rptr. 674, 577 P.2d 1014 (1978).

Applying these principles of statutory construction, the Court finds that the Assets being sold do not qualify as a "health facility" within the meaning of Cal. Corp. Code § 5914(a) or Cal. Health & Safety Code § 1250. All patients were transferred out of the Hospital by 4:00 p.m. on February 1, 2017. As of that date, the Hospital was completely closed. All signage was covered and the doors were locked. The Hospital has not, and cannot, receive new patients. The plain language of Cal. Health & Safety Code § 1250 establishes that a facility qualifies as a "health

facility" only if it is operating and receiving patients. The statutes specifies the characteristics of a "health facility" in the present tense—a facility qualifies only if it "*is* ... operated for the diagnosis, care, prevention, and treatment of human illness" (emphasis added). Cal. Health & Safety Code § 1250. "In construing statutes, the use of verb tense by the Legislature is considered significant." *Hughes, supra*, 17 Cal.4th at 776. The statute does not say that it applies to a facility that "is *or previously was* operated for the ... treatment of human illness." In addition, a facility that is closed cannot meet the other requirements of the statute's definition—a closed facility cannot diagnose or care for patients, or admit patients for a 24-hour stay or longer. In sum, the statute clearly and unambiguously applies only to health facilities that are operating. Because the Assets being sold do not include an operating hospital, they do not constitute a "health facility," Cal. Corp. Code § 5914(a) does not apply, and the Debtor is not required to obtain the approval of the Attorney General to sell the Assets.

The Attorney General maintains that Cal. Corp. Code § 5914(a) applies because the Debtor "controls" the Assets being sold, notwithstanding the fact that the Hospital is closed. That argument misses the mark. No one disputes that the Debtor controls the Assets in question, but that is not the issue. The issue is whether the Assets qualify as a "health facility" within the meaning of Cal. Health & Safety Code § 1250—and as explained above, they do not.

The possibility that the purchaser may be able to reinstate the suspended license once the transaction closes does not change this fact. If the purchaser reinstates the license and opens a new general acute care hospital, the Assets may meet the definition of a "health facility" at some point in the future. But the future status of the Assets is irrelevant. All that matters is whether the Assets are a "health facility" now.

In this regard, the Court notes that reinstatement of the license is by no means an automatic process. To obtain reinstatement the applicant must submit satisfactory evidence of its reputable character and its ability to comply with all applicable health and safety regulations. *See* Cal. Health & Safety Code § 1265. Therefore, the Court's determination that Cal. Corp. Code § 5914(a) does not apply will not allow the purchaser to operate a health facility without adequate oversight.

The Attorney General next argues that permitting the sale to proceed without his consent will subvert Cal. Corp. Code § 5914's purpose of protecting public health, safety, and welfare, by encouraging other health facilities to temporarily cease operations in order to circumvent the Attorney General's review of a sale of those facilities' assets. According to the Attorney General, allowing the Assets to be sold free of his review, when the Assets may be used as a health facility in the future, is an absurd result that requires the Court to depart from the literal language of the statute. The Court's construction, the Attorney General maintains, would defeat the legislation's purpose of ensuring that charitable healthcare assets could not be transferred from non-profit to for-profit entities absent regulatory oversight.

The Court does not agree that enforcing the literal language of the statute produces an absurd result demonstrably at odds with legislative intent. The Legislature enacted Cal. Corp. Code § 5914 to ensure that the public was not deprived of the benefits of charitable health facilities as a result of the transfer of those facilities' assets to for-profit entities. In enacting § 5914, the Legislature found:

> Charitable, nonprofit health facilities have a substantial and beneficial effect on the
> provision of health care to the people of California, providing as part of their charitable
> mission uncompensated care to uninsured low-income families and under-compensated
> care to the poor, elderly, and disabled.

> Transfers of the assets of nonprofit, charitable health facilities to the for-profit sector, such as by sale, joint venture, or other sharing of assets, directly affect the charitable use of those assets and may affect the availability of community health care services....
>
> It is in the best interests of the public to ensure that the public interest is fully protected whenever the assets of a charitable nonprofit health facility are transferred out of the charitable trust and to a for-profit or mutual benefit entity.

1996 Cal. Legis. Serv. Ch. 1105 (A.B. 3101) (West).

Here, the Hospital was not operating at the time of the sale and thus was providing no healthcare services to uninsured low-income families. As a result, the Legislature's objective of preserving charitable health facilities for the benefit of the uninsured is not implicated by the sale of the former Hospital's Assets. In addition, the Assets are fully encumbered by the claims of secured creditors, leaving no remaining equity that could be devoted to charitable purposes. With the charitable assets having been exhausted, nothing remains to be protected by the Attorney General.

The Attorney General's concern that health facilities will deliberately close in order to sell their Assets free of the Attorney General's review is belied by the history of this case. Now that the Hospital has closed, the value the estate will receive on account of the sale has plunged from approximately $19.5 million to approximately $6.6 million. It is true that the present sale allows the Debtor to retain accounts receivable, which was not the case in the previous sale. But even after adjusting for this difference, the loss in value attributable to the closure of the Hospital is in the neighborhood of $8 million. It defies credulity to assume that other non-profit hospitals would voluntarily close to escape the Attorney General's review of a sale, when closure results in such significant value destruction.

Nor is there any indication here that the Debtor closed the Hospital for the purpose of evading the Attorney General's review of a sale. The Debtor initially attempted to sell the Hospital as an operating entity, and applied to the Attorney General for review of the sale. After the Attorney General imposed onerous and unrealistic financial conditions on the transaction, the Debtor, the proposed buyer, and representatives of the Debtor's employee unions met with the Attorney General in a good-faith effort to obtain amendments to the conditions that would allow the sale to close. The Attorney General refused to modify the conditions. Only after it became impossible for the Debtor to sell the Hospital as an operating entity did the Debtor close the Hospital and seek to sell the Assets free of the Attorney General's review.

The Attorney General's assertion that health facilities will strategically close to circumvent oversight also ignores the reality that closing a hospital is time-consuming, costly, and requires fastidious planning. It is not a matter of simply locking the doors and putting up a "Gone Out of Business" sign. The reports prepared by the Patient Care Ombudsman appointed in this case illustrate the extent of the work performed by the Debtor to close the Hospital. The Debtor was required to insure that all patients were either discharged or relocated to suitable alternative facilities. Patient relocation provided particularly difficult, as many hospitals refused to accept certain patients because they lacked sufficient insurance coverage.[4] The Debtor was required to terminate over 100 remaining staff members.[5] The Debtor was required to arrange for medication

---

[4] See Second Interim Report of Patient Care Ombudsman Pursuant to 11 U.S.C. § 333(b)(2) [Doc No. 657] at 10–16 (describing the difficulties the Hospital encountered in relocating patients).
[5] Id. at 13.

remaining in its pharmacy to be returned to suppliers.[6] Arrangements for suppliers to retrieve expensive and fragile leased medical equipment had to be made.[7] The Debtor was required to comply with health and safety regulations, which were enforced by a daily on-site surveyor from the California Department of Public Health.[8]

Finally, the Attorney General argues that sale of the Assets free of the Attorney General's review and consent is a violation of 28 U.S.C. § 959(b). Section 959(b) requires the Debtor to "manage and operate the property" in its possession "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." The Attorney General's argument lacks merit. First, § 959(b) applies only when the Debtor continues to operate its business, and does not apply where, as here, the Debtor is liquidating its assets. *See, e.g., S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th Cir. 2010) ("Modern courts have … concluded that § 959(b) does not apply to liquidations"); *Alabama Surface Min. Comm'n v. N.P. Min. Co. (In re N.P. Min. Co., Inc.)*, 963 F.2d 1449, 1460 (11th Cir. 1992) ("A number of courts have held that section 959(b) does not apply when a business's operations have ceased and its assets are being liquidated"); *Saravia v. 1736 18th St., N.W., Ltd. P'ship*, 844 F.2d 823, 827 (D.C. Cir. 1988) (viewing §959(b) "as applying only to operating businesses, not ones that were in the process of being liquidated"). Second, even if § 959(b) did apply to the Debtor, the sale of the Assets free of the Attorney General's review and consent does not violate applicable state law, as explained above.

### C. The Attorney General's Application for a Stay Pending Appeal of the Order Approving the Sale is Denied

The Attorney General's application for a stay pending appeal of the order approving the sale (the "Sale Order") is denied. Pursuant to Fed. R. Bankr. P. 8007(a)(1), the Court may issue a stay of a judgment, order, or decree pending appeal. In determining whether to grant a stay pending appeal, the Court considers the following four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009).

As the Supreme Court has explained, a stay pending appeal

> "is not a matter of right, even if irreparable injury might otherwise result." *Virginian R. Co.*, 272 U.S., at 672, 47 S.Ct. 222. It is instead "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Id.*, at 672–673, 47 S.Ct. 222; see *Hilton, supra*, at 777, 107 S.Ct. 2113 ("[T]he traditional stay factors contemplate individualized judgments in each case"). The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion….

---

[6] *Id.* at 12.

[7] *Id.* at 15.

[8] *Id.* at 11–13 (describing daily visits by the California Department of Pubic Health to monitor the Hospital's orderly shutdown).

The first two factors of the traditional standard are the most critical. It is not enough that the chance of success on the merits be "better than negligible." ... By the same token, simply showing some "possibility of irreparable injury," *Abbassi v. INS,* 143 F.3d 513, 514 (C.A.9 1998), fails to satisfy the second factor.

*Id.* at 433–35.

To be entitled to a stay pending appeal, the moving party must make a "minimum permissible showing" with respect to each of the four factors. *Leiva-Perez v. Holder,* 640 F.3d 962, 965 (9th Cir. 2011). Provided the moving party meets a minimum threshold as to each factor, the Court may "balance the various stay factors once they are established." *Id.* at 965. Under this balancing approach, a stronger showing of irreparable harm can offset a weaker showing of likelihood of success on the merits, and vice versa—provided that the minimum threshold with respect to each factor has been established. *Id.* at 965–66; *see also id.* at 964 ("Petitioner must show either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor. These standards represent the outer extremes of a continuum, with the relative hardships to the parties providing the critical element in determining at what point on the continuum a stay pending review is justified.").

1. Likelihood of Success on the Merits

As the Ninth Circuit has explained:

The first showing a stay petitioner must make is "a strong showing that he is likely to succeed on the merits." *Id.* at 1761 (quoting *Hilton,* 481 U.S. at 776, 107 S.Ct. 2113) (quotation marks omitted). There is some uncertainty as to the exact degree of likely success that stay petitioners must show, due principally to the fact that courts routinely use different formulations to describe this element of the stay test. What is clear, however, is that to justify a stay, petitioners need not demonstrate that it is more likely than not that they will win on the merits....

There are many ways to articulate the minimum quantum of likely success necessary to justify a stay—be it a "reasonable probability" or "fair prospect," as *Hollingsworth,* 130 S.Ct. at 710, suggests; "a substantial case on the merits," in *Hilton*'s words, 481 U.S. at 778, 107 S.Ct. 2113; or, as articulated in *Abbassi,* 143 F.3d at 514, that "serious legal questions are raised." We think these formulations are essentially interchangeable, and that none of them demand a showing that success is more likely than not. Regardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that she has a substantial case for relief on the merits.

*Leiva-Perez,* 640 F.3d at 967–68.

The Attorney General has failed to demonstrate that he is likely to succeed on the merits. As discussed above, accepting the Attorney General's argument that the closed Hospital qualifies as a "health facility" under Cal. Health & Safety Code § 1250 would require the Court to read into the statute language that is not there. No absurd result flows from applying the statute's plain language, which means that the Court is required to enforce the statute according to its terms.

2. Irreparable Injury

The Attorney General argues that he will be irreparably injured absent a stay because the closing of the sale, in conjunction with the Court's finding that American Specialty is a good-faith purchaser within the meaning of § 363(m), will render an appeal moot. As a result, the Attorney General argues, he will be unable to obtain appellate review of an important issue affecting the welfare of the people of California.

Outside the bankruptcy context, the Ninth Circuit has held that the certainty that an appeal will become moot is enough to constitute irreparable injury. *See Artukovic v. Rison,* 784 F.2d 1354, 1356 (9th Cir.1986). However, within bankruptcy, a majority of courts have concluded that mootness does not demonstrate irreparable injury. *See, e.g., Ohanian v. Irwin (In re Irwin),* 338 B.R. 839, 853 (E.D. Cal. 2006) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm"); *In re Red Mountain Mach. Co.,* 451 B.R. 897, 908-09 (Bankr. D. Ariz. 2011) (internal citations omitted) ("[T]he law is clear in the Ninth Circuit that irreparable injury cannot be shown solely from the possibility that an appeal may be moot"); *In re Convenience USA, Inc.,* 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) (stating that "a majority of the cases which have considered the issue have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury" and citing cases).

The inquiry is complicated in this case by the fact that the Attorney General seeks review of an important issue of state law that will likely recur in future bankruptcy cases. Therefore, although the question is a close one, the Court finds that under the circumstances of this case the likelihood of mootness does amount to irreparable harm. However, a stay pending appeal is not a matter of right "even if irreparable injury might otherwise result." *Nken,* 556 U.S. at 427. Given that the three other factors weigh strongly against a stay, the Court declines to issue a stay notwithstanding the Attorney General's showing of irreparable injury.

3. Balance of the Hardships

The injury to the Debtor resulting from issuance of a stay will be substantially greater than the injury to the Attorney General from denial of a stay. The estate is in a precarious financial position and is desperately in need of the funds from the sale. As discussed above, the collapse of the previous sale has already caused the estate's financial position to deteriorate significantly. Issuance of a stay could cause the present sale to collapse, depriving the estate of much-needed funds. By contrast, denial of a stay will most likely result in the Attorney General being unable to obtain appellate review of the Court's decision. This injury is less severe than the financial injury the Debtor would likely suffer were a stay issued, because the Court has found that the Attorney General's appeal is unlikely to succeed and does not raise serious legal questions.

4. Public Interest

"There is a great public interest in the efficient administration of the bankruptcy system." *Adelson v. Smith (In re Smith),* 397 B.R. 134, 148 (Bankr. D. Nev. 2008). As noted, a stay could cause the sale to collapse, seriously injuring the estate. Here, the public's interest in the Attorney General's ability to obtain appellate review with respect to an important state law issue is outweighed by the public's interest in efficient administration of the bankruptcy system, particularly in view of the Court's determination that the Attorney General's appeal is unlikely to succeed.

### D. American Specialty is a Good-Faith Purchaser Pursuant to Bankruptcy Code § 363(m)

Section 363(m) provides that the "reversal or modification on appeal of an authorization …
of a sale or lease of property does not affect the validity of a sale or lease under such
authorization to an entity that purchased or leased such property in good faith, whether or not
such entity knew of the pendency of the appeal, unless such authorization and such sale or lease
were stayed pending appeal." Based on the testimony of Dr. Gurpreet Singh, American
Specialty's principal, the Court finds that American Specialty is a good-faith purchaser within
the meaning of § 363(m).

In one of the more bizarre objections to a § 363(m) determination that this Court has
encountered, Promise Hospital of East Los Angeles, L.P. ("Promise"), the disgruntled stalking-
horse bidder who lost to American Specialty, maintains that American Specialty is not a good-
faith purchaser, on the grounds that Dr. Singh failed to disclose to the Court the extent of his due
diligence discussions with the Debtor prior to the auction. Before American Specialty's overbid,
the Debtor intended to sell the Assets to Promise for $4.5 million. American Specialty's bidding
increased the sale price to $6.7 million. The purpose of § 363(m) is to discourage bidders from
colluding for the purpose of driving down the sales prices at bankruptcy auctions. *See Ewell v.
Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992) ("Typically, lack of good faith is shown
by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take
grossly unfair advantage of other bidders"). Here, American Specialty's bidding increased the
value received by the estate on account of the sale by $2.1 million. Promise's objections are
nothing more than a last-ditch attempt to scuttle the sale to American Specialty so that it may
buy the Assets on the cheap.

### E. Promise's Other Objections to American Specialty's Bid are Overruled

Promise argues that the Court's determination to allow American Specialty to bid at the sale
hearing violated its due process rights, since the Debtor noticed the hearing as a private sale not
subject to overbids. Promise cites *In re Northern Star Indus., Inc.*, 38 B.R. 1019 (E.D.N.Y. 1984)
in support of its position. In *Northern Star*, the Trustee sought approval of a sale of real property
to Wardam Steel Corporation ("Wardam Steel"). *Id.* at 1020. Because no objections were filed to
the sale motion, Wardam did not attend the sale hearing. *Id.* At the sale hearing, Sydney Bletter
appeared and presented a purchaser offer superior to Wardam Steel's. *Id.* The bankruptcy court
approved the sale to Mr. Bletter. *Id.* Wardam objected to the bankruptcy court's ruling, stating
that it had already made substantial improvements to the property in reliance upon the fact that
no objections had been filed to the original proposed sale. *Id.* at 1021. The district court
overturned the bankruptcy court's ruling, finding that the bankruptcy court's decision to accept
Mr. Bletter's increased offer, without notice to Wardam Steel, violated Wardam Steel's due
process rights. *Id.*

Unlike the losing bidder in *Northern Star*, Promise both participated in the sale hearing and
had advance notice that the Court was likely to consider overbids at the sale hearing. The day
prior to the sale hearing, the Court made available to the parties its tentative ruling, which stated
that the Court was inclined to approve American Specialty's bid over Promise's. Likely because
of the distinct possibility of an auction, Promise appeared at the hearing via counsel and with its
CEO, Peter Baranoff, and CFO, James Hopwood. As bidding progressed, the Court granted
Promise a one-hour recess to allow it to further consider its bidding position. Thus, Promise had
a full opportunity to participate in the auction, and there was no violation of its due process
rights. In addition, contrary to the situation in *Northern Star*, Promise has not made capital

improvements to the Assets. *Northern Star* is inapposite, and Promise's objections to the Court's decision to allow American Specialty to bid are overruled.

## III. Conclusion

For the foregoing reasons, the Assets of the closed Hospital are not a "health facility" within the meaning of Cal. Corp. Code § 5914(a). Consequently, the Debtor is not required to obtain the consent of the Attorney General prior to selling those Assets. The Attorney General's contention that he has the authority to review the sale is an "interest in ... property" within the meaning of Bankruptcy Code § 363(f). The Assets may be sold free and clear of that interest pursuant to Bankruptcy Code § 363(f)(1).

###

Date: May 15, 2017

Ernest M. Robles
United States Bankruptcy Judge