UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
www.flnb.uscourts.gov

In re:

                                  Case No. 17-40185-KKS

CAMPBELLTON-GRACEVILLE
HOSPITAL CORPORATION,                 Chapter 11

            Debtor.

_____/

**NOTICE OF FILING DECLARATIONS OF FRANK P. TERZO,
MARSHALL GLADE, AND MELISSA SCOTT IN SUPPORT OF
LIQUIDATING TRUSTEE'S EXPEDITED MOTION TO EXTEND
<u>DEADLINE TO FILE ADVERSARY PROCEEDINGS (ECF NO. 980)</u>**

Marshall Glade (the "**Liquidating Trustee**"), as Trustee of the Campbellton-

Graceville Hospital Liquidating Trust (the "**Liquidating Trust**"), by his

undersigned counsel, hereby files the attached:

1.       Declaration of Frank P. Terzo in Support of Liquidating Trustee's
Expedited Motion to Extend Deadline to File Adversary Proceedings.

2.       Declaration of Marshall Glade in Support of Liquidating Trustee's
Expedited Motion to Extend Deadline to File Adversary Proceedings.

3.       Declaration of Melissa Scott in Support of Liquidating Trustee's
Expedited Motion to Extend Deadline to File Adversary Proceedings.

Dated: April 12th, 2019                    Respectfully submitted,

BERGER SINGERMAN LLP                NELSON MULLINS BROAD AND CASSEL
*Co-Counsel for Liquidating Trustee*      *Co-Counsel for Liquidating Trustee*
313 North Monroe Street, Suite 301       100 S.E. 3rd Avenue, Suite 2700
Tallahassee, FL 32301                    Ft. Lauderdale, FL 33394
Tel. (850) 561-3010                      Tel. (954) 764-7060
Fax (850) 561-3013                       Fax (954) 761-8135

By:  /s/Brian G Rich                     By: */s/ Frank P. Terzo*
     Brian G Rich                             Frank P. Terzo
     Florida Bar No. 38229                    Florida Bar No. 906263
     brich@bergersingerman.com               frank.terzo@nelsonmullins.com
     Michael J. Niles                         Gary M. Freedman
     Florida Bar No. 107203                   Florida Bar No. 72760
     mniles@bergersingerman.com              gary.freedman@nelsonmullins.com
                                              Michael D. Lessne
                                              Florida Bar No. 73881
                                              michael.lessne@nelsonmullins.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2019, I electronically filed this motion with the clerk of the court using CM/ECF, which is serving the document (and all exhibits) via transmission of Notices of Electronic Filing to those counsel or parties who are authorized to receive such notices as reflected on the attached CM/ECF Service List.

By:  */s/ Frank P. Terzo*
     Frank P. Terzo
     Florida Bar No. 906263
     Frank.terzo@nelsonmullins.com

## CM/ECF SERVICE LIST

- Yussuf Abdel-aleem   john.wisiackas@aleemlaw.com
- Philip Alan Bates   pbates@philipbates.net, swalton@philipbates.net;abridges@philipbates.net;dwatts@philipbates.net
- Russell M. Blain   rblain.ecf@srbp.com, rblain@srbp.com
- Leyza F. Blanco   lblanco@sequorlaw.com, jdiaz@sequorlaw.com
- Jason B. Burnett   jason.burnett@gray-robinson.com, ken.jacobs@gray-robinson.com;kim.miller@gray-robinson.com
- Seldon J. Childers   jchilders@smartbizlaw.com, ellen.lord@smartbizlaw.com;jkirkconnell@smartbizlaw.com;documents@prodoxprep.com;childers@ecf.courtdrive.com
- William H. Crawford   bkry@tcslawfirm.net, william@tcslawfirm.net;sam@tcslawfirm.net
- Daniel Charles Curth   danc@goldmclaw.com, mattm@goldmclaw.com;haroldi@goldmclaw.com;seanw@goldmclaw.com
- Michael Patrick Dickey   mdickey@barronredding.com, creynolds@barronredding.com;chodges@barronredding.com
- Jodi Daniel Dubose   jdubose@srbp.com, lhathaway@srbp.com;jdubose.ecf@srbp.com
- Ashlea Ann Edwards   ashlea.edwards@gray-robinson.com
- Jason H. Egan   jason.h.egan@usdoj.gov
- Katherine Fackler   katherine.fackler@akerman.com, Jennifer.meehan@akerman.com;matthew.drawdy@akerman.com
- Gary M. Freedman   gfreedman@broadandcassel.com
- Kathryn Michelle Jordan   michelle@blankenshipjordanpa.com, service@blankenshipjordanpa.com
- Matthew Ian Kramer   mkramer@wwhgd.com, mesteva@wwhgd.com
- Michael D. Lessne   Michael.lessne@nelsonmullins.com, Jennifer.phillips@nelsonmullins.com;lisa.negron@nelsonmullins.com
- Pamela Marsh   pmarsh@ausley.com, sshaffer@ausley.com
- Kenneth G. M. Mather   kmather@gunster.com, tkennedy@gunster.com;mweaver@gunster.com
- Courtney A. McCormick   cmccormick@mcguirewoods.com, flservice@mcguirewoods.com
- Ronald A. Mowrey   rmowrey@mowreylaw.com, firm@mowreylaw.com
- Michael J Niles   mniles@bergersingerman.com, Charlee.loree@nelsonmullins.com
- Nicole Mariani Noel   bankruptcynotices@kasslaw.com, nmnoel@ecf.courtdrive.com

- Geoffrey J. Peters   gpeters@weltman.com, colnationalecf@weltman.com
- Brian G. Rich   brich@bergersingerman.com, efile@bergersingerman.com;bwalter@bergersingerman.com;efile@ecf.inforuptcy.com
- JAMES D. SILVER   jsilver@kelleykronenberg.com, raldama@kelleykronenberg.com
- Frank Paul Terzo   frank.terzo@nelsonmullins.com, Jennifer.phillips@nelsonmullins.com;lisa.negron@nelsonmullins.com
- United States Trustee   USTPRegion21.TL.ECF@usdoj.gov
- Adam M Walters   awalters@walterslawpc.com
- Sarah St John Walton   swalton@philipbates.net, pbates@philipbates.net;wwest@philipbates.net;abridges@philipbates.net
- Alan Weiss   alan.weiss@hklaw.com, lynette.mattison@hklaw.com
- David Luther Woodward   woodlaw@bellsouth.net, thetexasnole@bellsouth.net

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
www.flnb.uscourts.gov

In re:                                                    Case No. 17-40185-KKS

CAMPBELLTON-GRACEVILLE HOSPITAL          Chapter 11
CORPORATION,

    Debtor.

_____/

**DECLARATION OF FRANK P. TERZO
IN SUPPORT OF LIQUIDATING TRUSTEE'S
EXPEDITED MOTION TO EXTEND DEADLINE
TO FILE ADVERSARY PROCEEDINGS (ECF NO. 980)**

1.    I am Frank P. Terzo and I am a partner at the law firm of Nelson Mullins Broad and Cassel. Since November 30, 2018, I have served as counsel to Marshall Glade (the "**Liquidating Trustee**"), Trustee of the Campbellton-Graceville Hospital Liquidating Trust (the "**Liquidating Trust**") in the above-captioned Chapter 11 bankruptcy case (the "**Bankruptcy Case**") of Campbellton-Graceville Hospital Corporation (the "**Debtor**"). Before then, since June 8, 2017, I represented the Official Committee of Unsecured Creditors (the "**Committee**") in the Bankruptcy Case.

2.    I make this Declaration upon personal knowledge that I have obtained from my role as counsel in the Bankruptcy Case, which includes the investigation of the business affairs of the Debtor. As discussed below, the investigation revealed a

1

far-ranging fraudulent laboratory billing scheme (the "**Laboratory Program**") that was operated out of the Campbellton-Graceville Hospital (the "**Hospital**"), which was previously a 25 bed, critical access hospital located in Graceville, Florida, a city with a population of less than 2,500 people.

3.       I make this Declaration in support of the *Liquidating Trustee's Expedited Motion to Extend Deadline to File Adversary Proceedings* (ECF No. 980). The fact allegations contained within that Motion are true and correct and incorporated herein.

### Background

4.       The Bankruptcy Case was commenced on May 6, 2017. At that time, the Debtor's priority was to continue providing healthcare to the Graceville/Jackson County, Florida community by either keeping the Hospital doors open or selling the facility.

5.       The Committee was formed on or about June 8, 2017, and selected me and the law firm of Broad and Cassel LLP now known as Nelson Mullins Broad and Cassel[1] as its counsel, and the Court approved my application *nunc pro tunc* to June 8, 2017.

---

[1] On August 1, 2018, Broad and Cassel, LLP and Nelson Mullins Riley & Scarborough LLP combined. In Florida, the firm does business as Nelson Mullins Broad and Cassel.

6.      Since the formation of the Committee, the Debtor[2] and the Committee[3] (and the Liquidating Trustee since November 30, 2018) have been working diligently to investigate the claims and causes of action now held by the Liquidating Trust that emanated from the Laboratory Program. The docket in the Bankruptcy Case and the related adversary proceedings that have been filed in this case reflect the efforts undertaken as part of the investigation of the Laboratory Program and the efforts to recover funds misappropriated through the Laboratory Program for the benefit of the Liquidating Trust beneficiaries.

7.      Our efforts in this regard have uncovered that the Hospital billed in excess of $300 million over a ten (10) month period for laboratory related services and was paid more than $130 million from third party payors as a result of claims fraudulently submitted through the Hospital under the Laboratory Program. The Hospital then paid more than $130 million to laboratories and other third parties who were directly involved with the Laboratory Program. In most instances, as far as we can tell, the laboratory testing was either not performed at all or performed by outside reference laboratories, the claims of which were ineligible for reimbursement in full or at the higher reimbursement rates paid as a result of the Hospital's status as a critical access hospital.  The Hospital virtually received nothing out of the laboratory

---

[2] All references to the Debtor's actions are by and through its attorneys and professionals.
[3] All references to the Committee's actions are by and through its attorneys and professionals.

3

program.

## Investigation and Discovery of the Laboratory Program

8.    Upon my retention by the Committee, I immediately began my involvement in investigating the prepetition actions of the Debtor to find out how it was possible for a rural hospital in Graceville, Florida to have accumulated significant debt of more than $130 Million from third party insurance payors in less than one year's time, and we ultimately uncovered the billing fraud that was operated out of the Hospital through the Laboratory Program.

9.    Over the months that followed, we visited the Hospital's facilities on numerous occasions and spent significant time interviewing prior employees, including laboratory supervisors, accessioners, laboratory technicians, nurses, hospital officers, board members, the pathologist, and IT personnel.

10.    During our visits, we took inventory of all computers and made forensic quality copies of all hard drives to preserve the data contained therein. We also followed up with certain employees no longer in the area. The information obtained during these visits was invaluable and sometimes overwhelming.

11.    We noted the lab equipment located at the Hospital and researched the types of tests and quantity of tests the equipment could handle. Surprisingly, the equipment required to perform the majority of the laboratory tests for which the hospital billed third party payors through the Laboratory Program did not exist at the

4

Hospital.

12.    In addition, the Committee, with the assistance of attorney Michelle Jordan, spent months reviewing thousands of physical documents maintained at the Hospital in storage units and the Debtor's electronic records.

13.    Although, these interviews and documents were helpful in laying the foundation of the investigation into the Laboratory Program, the investigation encountered delay because the hospital records regarding the Laboratory Program were missing, and the Committee was initially unable to replicate the data based on the information in the Debtor's possession and obtained through the preservation of the hard drives.

### The Arduous and Time Consuming Task of Obtaining Information Regarding the Laboratory Program

14.    We also set up several in-person and telephone meetings with the third party payors, including Florida Blue Cross Blue Shield ("Florida Blue"), United Healthcare, and Aetna, to learn about their internal investigations and obtain a better understanding of the Laboratory Program. The Committee and the Debtor subsequently reached out to these third party payors requesting claim submittal records related to the Laboratory Program, however, the third party payors were unable to provide the documents and information requested.

15.    The Committee and the Debtor made multiple attempts to recover the claim images for the laboratory tests submitted by the Hospital to third party payors,

5

including Florida Blue and United Healthcare. The third party payors asserted that their electronic claims processing systems could not provide the actual image of the claims submission so we had to turn to other alternatives to review those images in order to see the underpinnings of the Laboratory Program.

16.     The Committee and the Debtor attempted to recover the image software from the Hospital's information system, Empower HIS, including seeking Court intervention. But we have been unsuccessful, receiving varied stories about why the data is not available.  To this day, the software (including the billing data) from the Emplower HIS has not been recovered.

17.     Back in February, 2018, the Committee and the Debtor jointly hired a laboratory consultant Melissa Scott, who has been integral in the Committee and Debtor's investigations into the Laboratory Program. In a separate declaration, Ms. Scott will address her investigatory efforts.

18.     With the assistance of Ms. Scott, multiple subpoenas were sent to the last-resort option to obtain the claims imaging information—the clearinghouses that process claims submission. In her declaration, Mrs. Scott will detail the arduous process she encountered in obtaining the clearinghouse information and building the database of claims data that was submitted to the third party payors, which revealed the National Provider Identification numbers of the physicians and healthcare providers that were listed on the claims for laboratory tests submitted by the Hospital

6

to the third party payors. The claims data reflects that the laboratory testing was usually ordered by a physician or a nurse practitioner and reflects that hundreds of doctors, located throughout the United States, were attending providers at the Hospital. The data reflects that the NPI Numbers of at least 25 physicians were used to order tests that were submitted for reimbursement and paid more than $100 million dollars.

### Time Consuming Mediations and Delayed Confirmation

19.    Through the Laboratory Program, almost all of the monies that were paid to the Hospital were subsequently transferred to the laboratories and other third parties who were involved in the Laboratory Program. As part of the Debtor and Committee's recovery efforts, they entered into settlement negotiations and mediations with two of the laboratories, Lifebrite Laboratories LLC ("Lifebrite") and Reliance Laboratory Testing, Inc. ("Reliance"). Those efforts lasted over 9 months from March to October, 2018. During the course of the mediation process with Lifebrite and Reliance, the Committee received non-confidential information that suggest that the laboratories who were involved with the Laboratory Program (at least 57) did not receive *all* the money that the Hospital billed and transferred to these reference laboratories, but rather significant dollars was siphoned out to third parties, including the ordering entities that were the requisition sources for lab testing.

20. Although plan confirmation was originally target for the Spring of 2018, it did not occur until October 31, 2018, due to significant delays caused by, among other things, the actions of the participants of the Laboratory Program, including a frivolous and unsuccessful attempt to disqualify Committee counsel by one of the litigation targets, motions to dismiss the bankruptcy case filed by litigation targets, and delay caused by the efforts to consummate the mediated settlements reached with Reliance and Lifebrite, including obtaining approval of the bar orders that were conditions of settlement. The funds generated by the settlements were crucial to the ability to effectuate plan confirmation (and avoid having to obtain litigation financing). Indeed, it took many months to obtain approval of the bar orders that were conditions of the Reliance and Lifebrite settlements from third party payor creditors who objected to confirmation. Confirmation was originally scheduled for April of 2018, and then was continued to May of 2018, and finally to October 31, 2018, and the Liquidating Trust was created on November 30, 2018.

**The Liquidating Trustee's Continued Investigation**

21. Since November 30, 2018, we have continued our diligent efforts to investigate the Laboratory Program and its participants and pursue claims and causes of action.

22. The Liquidating Trustee sought, and the Court has approved, procedures for two rounds of adversary proceedings—first against initial transferee

8

laboratories involved in the Laboratory Program and second against the potential secondary transferee physicians and other healthcare providers whose NPI Numbers were used by the Hospital or those who were otherwise involved in the Laboratory Program.

23. The Liquidating Trustee has commenced the first round of adversary proceedings by filing suit against 24 laboratories.

24. The Liquidating Trustee is investigating the physicians and other healthcare providers who were involved in the Laboratory Program. The Liquidating Trustee has sent out 672 letters and subpoenas to physicians and healthcare providers whose NPI numbers were used to bill for the lab tests through the Hospital, requesting information and documents regarding the possible monies they received and their involvement in the Laboratory Program, as well as certain additional information, including the names of any middlemen who solicited participants to the Laboratory Program. Many of the providers have requested that Mrs. Scott prepare a report listing the patients billed under their NPI Number in order to identify the records in question, and each supplemental information request requires preparation of a physician specific report and memorandum, which has significantly delayed the receipt of responsive documents required to determine the validity of testing and extent of the healthcare involvement in the Laboratory Program. And now, many responses to the subpoena appear to implicate sober homes, rehab centers, mental

9

health facilities, drug rehabilitation centers, and "marketing companies." Further to our continuing investigation, on April 11, 2019, the Liquidating Trustee filed a motion to compel against the recipients of the subpoenas who have failed or refused to respond to the subpoenas.

25.    Recently, we have taken depositions of several key witnesses who were involved in the Laboratory Program, which have revealed additional details and potential claims and causes of action against third parties. The Liquidating Trustee intends to take additional discovery as part of his investigation in order to uncover additional details of the Laboratory Program and claims and causes of action against third parties.

26.    Until the Liquidating Trustee completes discovery and his investigation, the Liquidating Trustee may not be able to identify all potential targets.

27.    The Liquidating Trustee has identified more than 1700 potential targets that the Trust may be able to pursue. However, as a result of the nature of the investigation into the Laboratory Program, including obfuscation of the Laboratory Program by its participants, the events that have taken place in the Bankruptcy Case, and the fact that additional details and claims and causes of action sought to be secreted continue to be uncovered, the Liquidating Trustee will not be able to pursue the vast majority of potential targets for the benefit of the Liquidating Trust

10

beneficiaries unless the statute of limitations that runs on Monday, May 6, 2019 is extended by the Court.

*I declare under penalty of perjury that the foregoing is true and correct.*

Executed on April 12, 2019.      _____

Frank Paul Terzo

11

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
www.flnb.uscourts.gov

IN RE:

Case No. 17-40185-KKS

CAMPBELLTON-GRACEVILLE HOSPITAL
CORPORATION,

Chapter 11

Debtor.

_____/

**DECLARATION OF MARSHALL GLADE IN SUPPORT OF
LIQUIDATING TRUSTEE'S
EXPEDITED MOTION TO EXTEND DEADLINE
TO FILE ADVERSARY PROCEEDINGS (ECF NO. 980)**

Marshall Glade, in my capacity as Liquidating Trustee of the Campbellton Graceville Hospital Liquidating Trust (the "**Trust**"), being duly sworn, hereby deposes and says:

1. My name is Marshall Glade. I am over 21 years of age and fully competent to make this declaration. Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration.

2. I am a senior managing director of Glass Ratner Advisory & Capital Group, LLC ("**Glass Ratner**). Glass Ratner and I have been involved with CGH since March 2017, when CGH engaged Glass Ratner to serve as a restructuring advisor. In March 2017, I was appointed as the Debtor's Chief Restructuring Officer. In November 2018, I was appointed as the Liquidating Trustee of the Campbellton Graceville Hospital Liquidating Trust pursuant to the Second

8484155-1

Amended Joint Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code, filed by the Debtor and Official Committee of Unsecured Creditors (the "**Plan**," ECF No. 812) and the Liquidating Trust Agreement dated as of November 30, 2018 (the "Liquidating Trust Agreement," (ECF No. 914).

3.      I make this affidavit in support of the Liquidating Trustee's Expedited Motion to Extend Deadline to File Adversary Proceedings (ECF No. 980) (the "**Motion**") and adopt and incorporate the facts set forth therein.

4.      In my capacity as the Chief Restructuring Officer of the Debtor and now Liquidating Trustee of the Trust, I am familiar with the business, operations and assets of the Debtor.  My duties as the CRO included the supervision of the Debtor's operations, and financial and business affairs.  I have been involved in strategic planning, communications, and interactions with estate professionals and interested parties.  I am also familiar with and participated in the investigation of the fraudulent laboratory billing scheme (the "**Laboratory Program**") that was operated out of the Campbellton-Graceville Hospital (the "**Hospital**").

5.      Pursuant to my role as Chief Restructuring Officer, my firm, Glass Ratner conducted a forensic accounting of the Debtor's financials during the time of the Laboratory Program and provided an analysis of the revenues received, the initial transferees of such revenues, and potential targets.

6.      The analysis and investigation of the Laboratory Program has been

2

8484155-1

on-going and I and my professionals have continued to learn additional facts through the mediations, settlements, depositions, and discovery requests which have uncovered multiple additional targets and potential causes of action. Glass Ratner, along with my other professionals have been working as fast as possible to complete its due diligence, but each uncovered layer of the Laboratory Program provides additional potential transferees and thus more recovery targets.

7.    Prior to confirmation and establishing the Liquidating Trust, the Debtor and Committee through their respective professionals, similarly, diligently investigated the Laboratory Program and the pursuit of targets identified from those investigations. Notwithstanding best efforts, the investigation was repeatedly delayed by the acts of third parties involved in the Laboratory Program, whose objective was to keep secret and otherwise obfuscate the underlying facts relating to their fraudulent scheme. Despites these efforts, the Trust has been able to ferret out sufficient information allowing for the service of over 650 subpoenas, filing over 24 Adversary Proceedings, and recovery of over $3.5 million dollars. As explained below, the information required to prepare the subpoenas and adversary complaints did not come effortlessly or timely.

8.    A substantial issue in our investigation relates to the Debtor's missing server and information contained therein.  Certain billing software was used to maintain and manage all of the Hospital's data, including all of the patient records

3

8484155-1

and financial data collected from the operation of the Hospital. Relevant here, that information system known as Empower HIS, included all relevant billing information related to the Laboratory Program. After the Laboratory Program was shut down, the local server containing all of this information went missing. As CRO, I personally reached out several times to (a) Empower HIS and its officers and (b) the Hospital's prior management company, requesting turnover of the server. Additionally, the Debtor and Committee filed Motions for Turnover compelling the parties to turn over the server. Although those motions were granted, we were never able to obtain the server or related information.

9.    It is important to emphasize the very nature of a fraudulent scheme like the Laboratory Program is to secrete its very existence and bury the evidence and obscure the trail leading the specifics of the scheme and those who participated in it.   As a result, the lack of the Debtor's own information required the Debtor and Committee to obtain the information from various other sources, including medical billing clearing houses, and to piecemeal various paper copies left at the Hospital to at least partially reconstruct the data into usable information in order to proceed with the investigation. This was not an easy or quick process. Further, because of the sensitivity of the information requested, the Trust was required to obtain HIPAA protective orders, which the Court graciously granted, but still delayed the process. However, because of the missing data the Trust was at a

4

severe disadvantage in initiating its investigation. In addition, as a result of the prolonged negotiations relating to the mediated settlements with Reliance Laboratory Testing, Inc. ("**Reliance**") and LifeBrite Laboratories LLC ("**Lifebrite**"), the consummation of which was a condition precedent to reaching confirmation, caused the delay of confirmation from the Spring of 2018 to October 2018.. Moreover, it was the provision of additional information from Reliance and Lifebrite under the terms of their respective settlements that lead us to discover another level of the Laboratory Program.

## Conclusion

10.   As reflected in the Declarations of Melissa Scott and Frank Terzo, during the time that I served as CRO, and Liquidating Trustee, I along with the estate professionals have worked with all dispatch to uncover the intricacies of the Laboratory Program.

11.   As Liquidating Trustee, it is imperative that the Motion is granted so that I can fulfill my duties as the Liquidating Trustee and maximize the recoveries for the Liquidating Trust beneficiaries.

12.   Based upon the facts set forth herein and the law as I understand it, I believe that sufficient cause exists to extend the time under Bankruptcy Code sections 108 and 546 for the Liquidating Trustee to file any and all litigation claims through and including, Monday, May 6, 2020.

5

8484155-1

13.     Therefore, I respectfully request that the Bankruptcy Court enter an order granting the Motion and for such other and further relief as is just and proper.

I, Marshall Glade, declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on April 12, 2019.

_____
Marshall Glade

6

8484155-1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
www.flnb.uscourts.gov

In re:                                              Case No. 17-40185-KKS

CAMPBELLTON-GRACEVILLE HOSPITAL          Chapter 11
CORPORATION,

    Debtor.

_____/

**DECLARATION OF MELISSA SCOTT
IN SUPPORT OF LIQUIDATING TRUSTEE'S
EXPEDITED MOTION TO EXTEND DEADLINE
TO FILE ADVERSARY PROCEEDINGS (ECF NO. 980)**

1.    I am Melissa Scott and I am a Senior Managing Director with GlassRatner Advisory & Capital Group, LLC. I was previously employed as a Director of Advisory Services with Change Healthcare (formerly known as Altegra Health Advisory Services).

2.    I have been involved with Campbellton-Graceville Hospital Corporation (the "**Debtor**") since February 9, 2018, as a consultant to provide ad hoc advisory services to the Debtor and the Official Committee of Unsecured Creditors (the "**Committee**"), and since November 30, 2018, I have served as a consultant to Marshall Glade (the "**Liquidating Trustee**"), Trustee of the Campbellton-Graceville Hospital Liquidating Trust (the "**Liquidating Trust**").

1

3. I make this Declaration in support of the *Liquidating Trustee's Expedited Motion to Extend Deadline to File Adversary Proceedings* (ECF No. 980) and is made based upon my personal knowledge.

4. I have more than 20 years of experience in the healthcare industry relating to healthcare operations, including with respect to clinical laboratories and healthcare fraud, and I specialize in coding, billing, and regulatory compliance. I am board certified in healthcare compliance as well as a certified professional coder.

5. I make this Declaration upon personal knowledge that I have obtained from my role as consultant in the above-captioned Chapter 11 bankruptcy case (the "**Bankruptcy Case**") and my investigation of the Debtor uncovering a far-ranging fraudulent laboratory billing scheme (the "**Laboratory Program**") that was operated out of the Campbellton-Graceville Hospital (the "**Hospital**").

6. I am very familiar with the Hospital and the Laboratory Program. My duties as consultant included investigating and identifying inappropriate reference laboratory activity and potential areas indicative of fraud; evaluating claims, laboratory regulatory compliance, billing standards, appropriateness of reimbursements; and interviewing related parties. In connection with my engagement, I have provided detailed analyses and reporting of the Laboratory Program to the Debtor, the Committee, and the Liquidating Trustee.

7. In my role as consultant, I have engaged in an extensive investigation

2

of the Laboratory Program in coordination with the professionals for the Debtor, the Committee, and the Liquidating Trustee, and been involved in strategic planning, communications, and interactions with these professionals. I have also attended multiple mediations, including with Empower HIS, LLC ("**Empower**"), Reliance Laboratory Testing, Inc. ("**Reliance**"), and Lifebrite Laboratories LLC ("**Lifebrite**"), and attended the depositions of Jose Prendes and Dr. Sergey Litvinov.

8.     The investigation into the Laboratory Program has been ongoing since prior to my employment on February 9, 2018, and despite the diligent efforts of the professionals, remains ongoing. While much of the detail regarding the Laboratory Program has been uncovered—including how its orchestrators were able to coerce third party payors to pay higher reimbursement rates under the critical access hospital fee schedule than was lawfully permitted, and the names of certain of the participants involved in the Laboratory Program—much is still unknown—including the extent to which the healthcare providers whose NPI Numbers were used in the claims submission process received monies out of the Laboratory Program or are otherwise implicated in the fraud and the identity of the individuals and entities that funneled specimens to the reference labs as part of the Laboratory Program.

9.     The Committee and the Debtor initially attempted to recover from Hospital management critical billing software regarding the Laboratory Program

3

from the Hospital's information system, Empower HIS, but despite numerous efforts, have been unsuccessful, receiving only an encrypted file that contained a backup of the Hospital's practice management system (i.e. patient records, vitals, flow sheets, notes), but did not contain any coding or billing information relating to the laboratory testing.

10.    The Committee and the Debtor were also unable to obtain the claims data from the third party payors.

11.    As a last resort to obtain the data and information, subpoenas were sent to the clearinghouses. In most instances, a healthcare provider uses a single outbound clearinghouse to relay electronic claims information between their billing system and the payer's claim adjudication platforms. We started with a clearinghouse that we knew one of the third party payors used exclusively, but then learned that there were numerous clearinghouses transmitting information on behalf of the Hospital (as the clearinghouse data included an indication of whether the clearinghouse received claims as a direct connection or secondary to the transmission from another clearinghouse). As each new claim data set was received and analyzed, it led to the identification of and subpoenaing of additional clearinghouses to reconstruct the full claims universe for the fraudulent billing that occurred.

12.    Once the subpoenas went out, the clearinghouses required protection through HIPAA protective orders.  With the claims data files originating from

4

multiple clearinghouse sources, we did not have the luxury of a uniform data set for analysis.  In some instances, raw data was received consisting of a text file string of loops and segments according to the electronic institutional claim (837I) transaction set, which would then have to be converted into a segmented data table for analysis. Because the information delivered was not, in some cases, totally readable, we had to go through the arduous process of collecting, normalizing and analyzing the data. In the absence of the original billing system data, this process was the only way to identify the referring providers who may have been downstream recipients of kickbacks in connection with the scheme.

13.    Using the data, we prepared an extensive database and have continued to be able to identify the manner in which the fraud was perpetrated. We learned that the claims were submitted for non-patients of the Hospital that were fraudulently identified as admitted patients, and we learned that hundreds of ordering providers from around the country (usually a physician, physician's assistant, or nurse practitioner) have been reported as the attending physicians for those admissions. By showing that the claims were of inpatients, the perpetrators were able to trigger higher reimbursement rates under the critical access fee schedule, rather than the significantly lower reimbursement rates that should have been paid for laboratory test submissions on non-patients. In addition, we were able to see the NPI numbers for the ordering physicians and the amounts that were charged, and we have been

5

able to connect the claims with the laboratories with whom the physicians may have had relationships. The data reflects that the NPI Numbers of at least 25 physicians were used to order tests that billed for more than $100 million dollars.

14. The process of working with, receiving information from, and processing the clearinghouse data has taken many months, and we are still waiting to receive claims information from one of the clearinghouses (as it has been retired from the vendor).

15. We have assisted with the preparation of 672 subpoenas of the providers whose NPI Numbers have been identified from the clearinghouse data, requesting, among other things, information and documents regarding the possible monies they received and their involvement in the Laboratory Program. The addresses for the providers were listed as the Hospital on the claims, so each provider's address had to be manually looked up using the NPI Number. Many of the providers have requested that I prepare a report listing the patients billed under their NPI Number in order to identify the records in question, and each supplemental information request requires preparation of a physician specific report and memorandum, which has significantly delayed the receipt of responsive documents required to determine the validity of testing and extent of the healthcare provider's involvement in the Laboratory Program as well as other participants in the Laboratory Program. In particular, we are still determining whether a particular

6

healthcare provider was complicit in the Laboratory Program, including whether the healthcare provider received direct payment for their participation or received indirect payment disguised as distributions from the labs, or whether their NPI Number was hijacked to perpetuate the fraud. In addition, many responses to the subpoena appear to implicate sober homes, rehab centers, mental health facilities, drug rehabilitation centers, and "marketing companies." Unfortunately, some may be out of business or uncollectible.

16. We have identified more than a thousand potential targets that the Trust may be able to pursue.

17. While there have been extensive efforts undertaken to investigate and uncover the Laboratory Program, there is still much information that remains unknown and that we hope to receive in discovery.

18. Until the Liquidating Trustee completes discovery and his investigation, the Liquidating Trustee may not be able to identify all potential targets.

19. I, Melissa Scott, declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on April 12, 2019. _____
                            Melissa Scott

7